# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORNELIUS A.BADGER, JR.<br>P.O. Box 60103<br>Philadelphia, PA 19102<br><br>BENTON  CAMBRIDGE, IV<br>920 North Street<br>Collingsdale, PA 19023<br><br>MAVERICK MITCHELL<br>5506  North 57th Street<br>Philadelphia, PA 19131<br><br>DONALD  THOMAS<br>5720 Chester Avenue, 3rd Floor<br>Philadelphia, PA 19143<br><br>GILBERT HARDY<br>1744 South Taylor Street<br>Philadelphia, PA 19145<br><br>ERIC CARTER<br>1428 South Chadwick<br>Philadelphia, PA 19146<br><br>MIKAIL ABDUL-KARIM<br>11 South Street, Suite 350<br>Philadelphia, PA 19147<br><br>AARON L. JOHNSON<br>83 South Mifflin Street<br>Philadelphia, PA 19145<br><br>SABRINA SHORTS<br>1805 West Montgomery Avenue<br>Philadelphia, PA 19121<br><br>ZIKIYYAH JACKSON<br>4283 Mantua Avenue<br>Philadelphia, PA 19104 | Civil Action No.09-03619 |

QUINTON KENNEDY
504 Meredith and Ct.
Raleigh, NC 27606

JAMES HORTON
600 Conshohocken State Road
Penn Valley, PA 19072

GOLDIE HEMMINGWAY
2036 South Larry Street
Philadelphia, PA 19142

      Plaintiffs,

  v.

STRYDEN, INC
1050 Crown Pointe Parkway
Atlanta, GA 30338

NOVOS ASSOCIATES, LLC
4780 Ashford Dunwoody Road, Suite A-421
Atlanta, GA 30038

MAJOR LOGISTICS, LLC
1231Chestnut Street, PMB 1
Philadelphia, PA 19107

     Defendants.

## FIRST AMENDED CLASS AND
## COLLECTIVE ACTION COMPLAINT

## I.  INTRODUCTION

  1.   Plaintiffs, Cornelius A. Badger, Jr. ("Badger"); Benton Cambridge, IV

("Cambridge"); Maverick Mitchell ("Mitchell"); Donald Thomas ("Thomas"); Gilbert Hardy

("Hardy"); Eric Carter ("Carter"); Mikail Abdul-Karim ("Abdul Karim"); Aaron L. Johnson

("Johnson"); Sabrina Shorts ("Shorts"); Zikkiyyah Jackson ("Jackson"); Quinton Kennedy

("Kennedy"); James Horton ("Horton"); and Goldie Hemmingway ("Hemmingway"),

collectively referred to as "Plaintiffs" or the "Individual Plaintiffs", have instituted these discrimination and fair wage proceedings on behalf of themselves individually, and on behalf of similarly situated blacks and/or African-Americans as a Rule 23 Class and as a 29 USC §216(b) Collective Action, by and through their counsel of record, Sidney L. Gold & Associates and Berger & Montague., against the defendants Stryden, Inc. ("Stryden"), Novos Associates LLC ("Novos") and Major Logistics LLC ("MLL").

2.      Stryden, either separately, or in concert with Novos and MLL, is alone liable or is jointly and severally liable with Novos or MLL, or both, for the systematic pattern and practice of race, color, national origin, and/or ethnic discrimination which has been inflicted upon the plaintiffs individually, and as members of the class or classes they seek to represent in the claims asserted by this First Amended Class and Collective Action Complaint ("First Amended Class Action Complaint").

3.      Many of the Plaintiffs (who, as a group, may hereafter be referred to as the "FLSA Plaintiffs), have also been injured by the ongoing policies and practices of Stryden, carried out alone or in concert with Novos and MLL, which have resulted in violations of the Fair Labor Standards Act ("FLSA") in regard to which the FLSA plaintiffs seek to represent similarly situated African-American employees in a 29 USC §216(b) Collective Action to obtain appropriate injunctive relief and to recover unpaid wages, unpaid overtime wages, and liquidated damages in an amount equivalent to the sum of all unpaid wages and unpaid overtime wages and attorneys fees.

4.      Plaintiff Badger has instituted a Collective Action under the Age Discrimination In Employment Act ("ADEA"), 29  U.S.C. § 621, *et. seq*. and 29 U.S.C.§ 216(b), brought on behalf of himself and similarly situated black and/or African-American older co-workers who worked for Stryden's predecessor and were denied the same opportunity automatically made

available for all of the younger workers employed by Stryden's predecessor to work for Stryden in violation of the of the ADEA and the PHRA, 43 P.S. § 951, *et.seq.*

5.      The employment practices, policies and conduct which give rise to defendants liability to plaintiffs, both individually and as a member of a Rule 23 Class or a §216(b) collective Action is more fully described below.

## II.      PARTIES

6.      Plaintiff, Badger, is a black African-American citizen of the Commonwealth of Pennsylvania, who was denied employment because of his age in or about November 2006, and after being given an opportunity to work for Stryden in September of 2007, was subsequently unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint.

7.      Plaintiff, Mitchell, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

8.      Plaintiff, Cambridge, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the  pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

9.      Plaintiff, Thomas, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and

privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

10.     Plaintiff, Hardy, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

11.     Plaintiff, Carter, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint.

12.     Plaintiff, Abdul-Karim, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

13.     Plaintiff, Johnson, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and /or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

14.     Plaintiff, Shorts, is a black African-American citizen of the Commonwealth of Pennsylvania, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of her color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

15.     Plaintiff, Jackson, is a black African-American citizen of the Commonwealth of Pennsylvania who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of her color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

16.     Plaintiff, Kennedy, is a black African-American who formerly resided in the Commonwealth of Pennsylvania but who now resides as a citizen in the State if North Carolina, who was unjustifiably terminated and denied other employment opportunities and privileges of employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint, who was also unlawfully denied the payment of wages and overtime wages.

17.     Plaintiff, Horton, is a black African-American citizen of the Commonwealth of Pennsylvania who applied for and was unjustifiably denied employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint.

18.     Plaintiff, Hemmingway, is a black African-American citizen of the Commonwealth of Pennsylvania who applied for and was unjustifiably denied employment because of his color, race, national origin, and/or ethnicity as part of the pattern and practice of discrimination described in this First Amended Class Action Complaint.

19.     Defendant, Stryden, is a corporation organized under the laws of the State of Georgia whose principal place of business is located at 1050 Crown Pointe Parkway, Atlanta, Georgia 30338.  Stryden is a national company that partners with Fortune 500 companies to provide technical, logistical support, and staffing services.

20.     Defendant, Novos, is a limited liability company organized under the laws of the State of Georgia with its principal place of business located at 4780 Ashford Dumwoody Road, Suite A421, Atlanta, Georgia 30338.  Novos is owned and controlled by Stryden and operates as an instrumentality or alter ego of Stryden.

21.     Defendant, MLL,  is a limited liability company organized under the laws of the Commonwealth of Pennsylvania whose President lists his address as 1231 Chestnut Street, PMB 1, Philadelphia, Pennsylvania, 19107-51.  It lists no other corporate address, including any "Registered Office Address."  MLL is controlled by Stryden and was operated as an instrumentality or alter ego of Stryden.

### III.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000e-5, 29 U.S.C. § 626(b), and 29 U.S.C. § 216(b).  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims under the PHRA, 43 P.S. § 51, *et seq*.

23.     Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) and (c).  The unlawful employment practices alleged herein were committed in this District, and most of the employment records relevant to such practices are maintained and administered in this District.

## IV.   GENERAL BACKGROUND FACTS

### A.   The Stryden Philadelphia Airport Region Contract

24.     National and Alamo are two of the nation's major car rental companies. As a car rental company, one of their requirements is to make sure that each of their rental outlets are stocked with a sufficient inventory of cars and vehicles to meet customer demand at each location where they rent cars or vehicles.  It must therefore make daily assessments of the overall requirements within a particular region in which it does business and distribute the entire fleet in a manner that maximizes the monetary return on their  overall fleet,

25.     In order to perform this function it is necessary for National and Alamo to retain "Drivers", whose function is to drive the car or vehicle from a location where there is adequate or excess inventory to locations where there are actual or potential shortages in inventory.

26.     After delivery is made, a so-called "Lead Driver" or "LD" must pick up the Driver and return the Driver to a home base where they can pick up another vehicle to deliver, or to a place where the Driver can obtain transportation that will enable the Driver to return home at the end of his or her shift.  LDs, who were also responsible for certain administrative tasks, were paid a higher hourly rate than Drivers.  The ratio between Drivers and LDs was approximately 6 to 1.

27.     For many years, National and Alamo performed the car transport function with members of their own work force.  It then outsourced this function to a company known as Tandem who, in turn, was replaced by Stryden on November 1, 2006.

28.     Under Stryden's contract with the parent of National and Alamo, it was Stryden's obligation to transport cars and vehicles from one location to another within the Philadelphia Airport Region ("PAR").  The "hub" of the PAR was the Philadelphia Airport itself where the regional offices of National and Alamo were located.  Stryden's local office was located in a

trailer on a parking lot near the airport that housed the National and Alamo vehicles available for use at the airport. The airport itself was the largest "outlet" within the PAR, but the region included outlets in Cherry Hill, New Jersey; the State of Delaware; and in Pennsylvania in Harrisburg, Allentown, King of Prussia, and Philadelphia at 30th Street Station.

29.     It is estimated that the Stryden PAR Contract ("SPC") required an overall Driver/LD work force that ranged between 60 to 90 employees who were deployed on as many as four different daily shifts (the number of shifts varied according to seasonal and other types of demand).

## B.     The *Cardwell* Age Discrimination Suit

30.     When Stryden took over the PAR contract, it recruited its work force for the new contact by automatically offering all of Tandem's former Drivers and Lead Drivers the same jobs they had performed for Tandem. A notable exception to this rule is that it refused to offer continuation employment to most of Tandem's older Drivers.

31.     As a consequence, Stryden was sued by a former Driver who initiated a claim filed on behalf of himself and similarly situated older drivers who were not offered the opportunity to continue to work for Stryden by dual filing a charge of age discrimination on December 12, 2006, 42 days after the Stryden took over the Tandam contract on November 1, 2006, and the claimant was told his services would not be needed by Stryden. *Cardwell v. Stryden, Inc.*, (E.D Pa. Civil Action No. 05075 at Doc.6, Attachment-2). The court certified an "opt-in" collective action under §216(b) of the FLSA as provided for by the ADEA. *Cardwell v. Stryden, Inc.*, 2009 U.S. Dist. LEXIS 43275, *5 (E.D. Pa. May 18, 2009).

32.     Despite the collective class certification, the parties settled the case before notice was given. Consequently, Badger, who should have been given notice as a potential class member, along with an untold number of other potential claimants, was never given notice that

the claim existed or was resolved.  However, before the *Cardwell* case was dismissed on

October 6, 2009, Badger dual filed charges of discrimination with the EEOC and the PHRC,

which identified "age" as one of the grounds for discrimination against him.

33.     At the time Stryden took over the Tandem work force, it is estimated that the

racial composition of the Driver/LD work force was 85% to 95% black and/or African-

American. The racial composition of the work force reflected the rate at which National/Alamo

and their successor, Tandem, hired black and African-American employees over a period of

time.

34.     The qualifications to become a Driver or Lead Driver were not rigorous. An

applicant had to show that he or she possessed  a valid driver's license, had a clean driving

record, and had not been convicted of any felonies.  Applicants were asked to complete an

application that was given to them at the interview that was in a hard copy format or the

applicant was asked to complete the interview online.  Each applicant was asked to identify his

or her race.   After a search of the applicants' driving and criminal record confirmed, if there was

no adverse information in regard to driving history or criminal record, offers were regularly

made "on the spot", within minutes or no more than a hour after the application was made and/or

the interview conducted.

35.     Stryden paid Drivers in the range of $7.25 to $7.50 per hour, and Lead Drivers were paid

in the range of $8.50 per hour.  Both were paid on the same day each week.  Drivers received

benefits in the form of unemployment and workers compensation and were granted "employee

discounts" whenever they rented National or Alamo vehicles for personal use.  Stryden hired

new Drivers with regularity because of the relatively high level of turnover for these jobs.

### C.     Stryden's Plan To Eliminate All African-Americans From The SPC Work Force And To Replace Them With Caucasian Hispanics

36.     The predominantly African-American composition of the work force Stryden inherited from National and Tandem remained stable from November 2006 until a management change was made in mid-2008.  In June 2008, Stryden appointed Thomas J. Krempa ("Krempa") as the chief of operations for the SPC.  In late September, Krempa hired Julio Rivera ("Rivera") as his Deputy.  Rivera is a Caucasian Hispanic of Puerto Rican heritage.

37.     At the time Rivera came on board though Krempa retained the titular head of operations for the SPC because he was being called upon to assist the company in other parts of the country, in particularly the Mid-west, he had to delegate the lion share of his daily managerial duties to Rivera simply because he was regularly away from the work site. Consequently, Rivera was immediately given near total control of recruitment, hiring, compensation, discipline, training, scheduling, overtime, rates of pay, promotion, and the enforcement of human resource and ethical policies.  Prior to taking on this new job, Rivera had worked at a community center that served the Puerto Rican community.  While it is fair, and even laudable, for a member of a minority to want to use a position of power and influence as a platform for creating opportunities for members of their own community and ethnicity, it is unlawful, unfair, unethical, and immoral for anyone to purposely create a work environment in which the sole determinant for the allocation of employment opportunities became skin color, race, national origin, and ethnicity and where management adopted the express objective of abolishing one race and ethnicity from the presence of the work place (black and African-American) so that it could be supplanted and replaced by another (Caucasian Hispanic) while utilizing ruthless means and methods to accomplish the ignoble mission of employment genocide.

38.     Rivera began by pursuing recruitment policies that focused exclusively on the Caucasian Hispanic Puerto Rican community.  Shortly after his arrival, as many as 50 Caucasian Hispanics per day would apply for jobs as Drivers.  Many of the applicants came from the community center where Rivera previously worked, and he personally knew or had prior relationships with many of the applicants or the person who referred the applicant.

39.     Rivera foreclosed consideration of individuals belonging to ethnicities that were not Hispanic. The only way to get into the "hiring" door was through channels that were Hispanic, and Rivera never made himself open or available to channels that were not Hispanic. For instance, he regularly placed recruitment ads in the Hispanic community papers but failed to do so in media that served other ethnic groups, such as the Philadelphia Tribune (which served the African-American community).

40.     In order to secure employment for the individuals who made applications, he would simply disregard the minimal standard that existed for the retention of Drivers and LDs. He hired people with serious driving violations (suggesting he either failed to check driving records or knowingly hired people he knew had records).  Based on information to which he had access from the community center, he knowingly hired people he knew had criminal records, in some cases involving convictions for auto theft.  As often happens with convicted felons, some of these hires betrayed his trust because he had to subsequently terminate them for stealing cars or GPS systems from the National lot.

41.     At the same time Rivera was hiring Caucasian Hispanic felons, he was rejecting the applications of over-qualified African-American police officers.  Indeed, no blacks and/or African-Americans were hired for the SPC from the date of  Rivera's arrival until the present. Indeed, no one who was not Hispanic was hired for the SPC, and the few non-Hispanic

Caucasians or Asians who were members of the work force prior to the arrival of Rivera were terminated.

42.    In order to create openings for the inventory of Hispanic applications that were mounting based on Rivera's vigorous recruitment efforts focused solely on the Hispanic community, he needed to get rid of the predominantly black and/or African-American  work force that he inherited upon his arrival in the fall of 2008.

43.    He began this process by posting a sign that stated words to the effect: " If you are no longer on the list, it means you have been  terminated."  Rivera told many of those he terminated in this manner that National was downsizing, and there was no work available but that they would be recalled when work picked back up.  This was an epic falsehood since he continued to vigorously recruit and hire Hispanic Drivers and LDs. .

44.    Upon his arrival, he immediately began to reduce the number of shifts made available for African-Americans.  Most Drivers regularly worked five shifts per work.  He began offering these experienced Drivers two to four shifts per week, which had two consequences.  By cutting back on two African-American Drivers, who had done nothing to warrant displacement, he could open up a new position for a Hispanic Driver.  Second, by cutting back on shifts offered African-Americans, he sharply reduced the income that could be earned on the job to the point where  he made it impossible for African-Americans to earn a living as Drivers – a job which provided an overall marginal income even when Drivers and LDs were fully utilized,

45.    If an African-American who discovered "he had been taken off the list" pressed for more information as to why he was taken off the list, management would simply fabricate an inherently implausible, or false reason and assert that it was a basis for termination.  The ready-made explanation for many terminations is that the Driver had been a "no show" or that they were being laid off due to a cutback in business.

46. He deliberately fostered a racially hostile environment by exercising all discretionary authority in a manner which systematically favored Hispanics and disfavored African-Americans. In addition to discriminating in the number of shifts made available to African-American, as described in greater detail below, African-Americans were less likely to actually be used on shift they had been scheduled to fill than their Hispanic counterparts. Hispanic Drivers were offered overtime opportunities, while similarly situated African-Americans were denied such opportunities. African-Americans received the least desirable job assignments.

47. Most poignantly, African-Americans knew that it was just a matter of time before they would be let go for non-existent or arbitrary reasons based solely on their race. Rivera openly acknowledged to high level officials at National that it was his intention to get rid of all African-Americans from the SPC. The persistent, overt, undisguised, and unapologetic race conscious conduct by the highest level of management coupled with the ominous presence of the vulture of inevitable termination that hovered over the work place permeated and polluted the atmosphere with a sense of dread and foreboding that made every minute in the environment an intolerable ordeal for African-American Drivers and LDs.

48. Rivera was terminated from employment in the spring of 2009. Krempa temporarily replaced him with Dave Serrono, a Caucasian Hispanic Lead Driver for a short time (three or four weeks) who was replaced by another Hispanic whose first name was "Ruben." Ruben continued the unlawful practices of Rivera and continued the mission of the Krempa/Rivera team by eliminating all visible traces of African-Americans from the SPC work force.

49.     Pursuant to the implementation of this overt, bold, and brazen policy of employment genocide, the new and recycled management team succeeded in fulfilling its mission of eliminating all blacks from SPC work force within approximately a year.

50.     Maverick Mitchell, a named plaintiff ,whose services were terminated in September 2009, was the last African-American to provide services for the SPC.   From September of 2009 until the present, no black or African-American has been hired to provide services for the SPC.  The pattern and practice of discrimination mandating the deliberate exclusion of blacks and African-Americans from the SPC work force, in addition to any other person who did not possess Hispanic ethnicity, was and remains deliberate, continuous, and ongoing.

51.     In carrying out its plan to eliminate all blacks and/or African-Americans from the SPC work force, during the year to fourteen month period in which the plan was implemented, Stryden fostered and created a hostile work environment, retaliated against those who asserted protected rights, and further discriminated as a matter of policy on the basis of race and ethnicity in hiring, promotions, compensation, work assignments, scheduling shifts, discipline, and involuntary unjustified terminations.

52.     The  racial disparities identified in Paragraph 46 were the inevitable consequences of Krempa's and Rivera's proactive race conscious policy of eliminating blacks from the SPC and replacing them with Caucasian Hispanics.

53.     This discrimination constitutes an ongoing regional pattern and practice of discrimination, which reflects the "regular" and "normal" way in which the company did its business, rather than a series of idiosyncratic and/or  isolated incidents.

54.      Stryden, as reflected in Complaints filed in federal courts across the nation, has engaged in serial violations of the civil rights and fair wage laws involving comparable patterns

and practices of discrimination and similar disregard of its obligations to pay its non-exempt

employees overtime and a fair wage. *See, Cardwell et.al v. Stryden, Inc.* (E.D. Pa. Civil Action

No.08-00570) (wholesale elimination of older workers in violation of ADEA); *Ali v. Stryden,*

*Inc.* (D.Minn. Civil Action No. 09-00817) (where Muslim workers were alleged to constitute

90% of the Drivers at Minnesota location company refused to accommodate their request to

celebrate religious holidays and alleged willful violations of fair wage laws); *Alsop v. Stryden,*

*Inc.* (S.D. Tex. Civil Action No.07-03029); and *Charles v. Stryden, Inc.* (M.D' Fla. Civil Action

No. 06-02107) (alleged willful violations of the FLSA).

55.     As reflected in the allegations of the *Ali* case, where it is alleged that 90% of the

Drivers on a contract for National and Alamo in Minnesota were Muslims, and the fact that 90%

of the Drivers on the SPC were black or African-American prior to the change in management

and became Hispanic after the management change, shows that it is the practice of Stryden to

segregate employees and/or independent contractors based on unlawful criteria such as race,

religion, national origin, color, ethnicity or age and to use only one type or one group of

employee and/or independent contractor at a particular location.

>           **D.      Stryden's Attempt To Evade Tax, Title VII, And FLSA**
>                     **Obligations By Making The False Claim That**
>                     **Drivers And LDs Were "Independent Contractors"**

56.     After Stryden took over the Tandem contract, the paychecks used to pay the

Individual plaintiffs and class members were drawn on the account of Novos from November

2006 until the change in management made in the late spring and early summer of 2008.

57.     During this timeframe, each individual plaintiff who was employed at that time

received a W-2 form.  Stryden paid the employer's share of its contribution to social security

(payroll taxes), and the income taxes of the plaintiffs and class members were withheld from

their paycheck.

58.     MLL was created as a Pennsylvania limited liability company on August 15,

2000.  In September 2008, the same time period in which the Krempa/Rivera team began the

implementation of its plan to eliminate all black and/or African-American employees from the

SPC work force, the Stryden new management team, aided and abetted by MLL, began

implementation of a plan to evade Stryden's obligation to pay payroll taxes and to avoid

compliance with Title VII and the FLSA by fraudulently and falsely claiming that its SPC

Drivers and LDs were "independent contractors" rather than employees.

59.     Beginning in the fall of 2008, all paychecks written to individual plaintiffs and

class members were drawn on the account of MLL.  Plaintiffs received a 1099 form in lieu of a

W-2, and income taxes were not withheld from their paychecks.  Stryden ceased making

payments of payroll taxes and required some, but not all, of the individual plaintiffs and class

members to sign a form acknowledging an obligation to pay income taxes on his or her 1099

income.  Stryden told many, if not all, of the class members who did sign an acknowledgment of

their obligation to pay taxes that they would receive no paycheck unless they signed the

acknowledgement.

60.     Notwithstanding Stryden's unilateral attempt to re-classify the relationship

between itself and its SPC Drivers and LDs as that of an "independent contractor", no

substantive changes were made in any aspect of the relationship between Stryden and its

employees whatsoever.  Stryden continued to treat each member of the SPC work force exactly

as it had in the past, and continued to exercise precisely the same degree of "dominance and

control" over the daily activities of the class members as it had in the past, when it openly

referred to and considered the SPC Drivers and LDs to be Stryden employees.

61.     With respect to every general and specific factor taken into consideration under

the applicable IRS test, where no single factor is dispositive and all should be considered in their

totality, **_none_** of the relevant factors support the conclusion that the individual plaintiffs or any class members in fact performed their duties in the capacity of an "independent contractor".

      A)     In regard to the factor of "behavioral control", Stryden determined: 1) when and where to do the work; 2) what tools or equipment to use; 3) what workers to hire or assist with the work; 4) where to purchase supplies and services; 5) what work must be performed by a specified individual; 6) what order or sequence to follow; 7) workers were trained by Stryden; and 8) Stryden never gave up but instead retained its right to control the details of the worker's performance.

      B)     In regard to financial control, class members: 1) incurred no unreimbursed expenses; 2) made no investment in the business; 3) were paid based on a set hourly rate on a weekly basis rather than as a lump sum; and 4) were not in a position to earn a "profit or loss" on their work activities.

      C)     In regard to the "type of relationship", class members: 1) had no written contract which designated them as "independent contractors" or which set forth the terms and conditions of the relationship, performance, or the requirements the Drivers were required to fulfill; 2) the business provided benefits in the form of workers and unemployment compensation and discounts on rentals from National and Alamo made for personal use and some employees were paid overtime; 3) viewed the relationship as permanent in the sense it was for an indefinite duration rather than for a specific project or period of time: and 4) provided a service that constituted the key or essential service provided to Stryden's customer – the transport of cars and vehicles from one location to another. *See,* http://www.irs.gov/pub/irs-pdf/p15a.pdf (PDF) at 5-8.

      62.     Application of the relevant IRS factors identified in Paragraph 61 to the facts of this case shows beyond cavil that any contention advanced by Stryden that the relationship

between Stryden and its Drivers and Lead Drivers was that of an "independent contractor" is a

sham that was proffered in bad faith to avoid tax, Title VII, and FLSA obligations and liabilities.

### E.     Stryden Was Responsible For All Employment Decisions Impacting  Divers And LD's Under The SPC

63.     Other than providing paychecks to individual plaintiffs or class members, no one

who represented themselves as affiliated with Novos or MLL ever made themselves visible as a

participant, decision-maker, or manager of the SPC to any of the individual plaintiffs or other

class members as far as they know.

64.     Even though Novos and MLL wrote paychecks on their own account, Krempa,

Rivera, and then Ruben, who at all times identified themselves as agents and representatives of

Stryden, continued to manage the SPC and made all of the business and employment decisions

which impacted plaintiffs and the overall operation of the SPC.

65.     Krempa and Rivera from time to time would consult with representatives of

National and Alamo, but the representatives of National and Alamo always made clear that

Krempa and Rivera were the agents of Stryden and that plaintiffs were under their direction and

control.

66.     When certain plaintiffs expressed their anxiety about the employment policies of

the Krempa/Rivera regime to members of National's management team, while the members

expressed concern and empathy for the plight of the African-American Drivers,  they stressed

there was nothing they could do about it because the employment policies and decisions were

made by Stryden.

### F.     Stryden's FLSA Violations

67.     Stryden violated the FLSA by calling more Drivers than were necessary to fill the

requirements for any particular shift in order to assure that there would be no shortages for the

shift.  Stryden regularly notified 15 to 18 Drivers to make themselves available for a shift, for

which only 8 to 12 Drivers would actually be given assignments. Despite the substantial risk that a Driver would not be selected for the shift for which he or she was called, if the Driver failed to appear, even if the requirements for a particular shift were satisfied, the Driver could nonetheless be designated a "no show", which could subsequently have serious consequences in terms of discipline or termination.

68. When more Drivers appeared for the shift than their were slots to fill, participants for the shift would be selected on a "first come, first served basis." Consequently, any Driver who wanted to secure a position for the shift had to be available from 45 minutes up to an hour or more before the shift actually began.

69. Drivers were not paid for this "waiting time". If the Driver was not selected because the number of Drivers exceed the number of positions that needed to be filled, the Driver was simply sent home without pay, no matter how long he had waited. If this "waiting time" is taken into consideration in calculating the number of hours worked by an employee for a day or week, many Drivers, including the FLSA Plaintiffs, regularly worked more than forty hours a week but received no compensation at all for the additional time.

70. Stryden failed to maintain accurate records as to when employees actually arrived at work in order to secure position on the shift for which they were called. Even though a Driver may have been available an hour or more before his or her shift was to begin, if the Driver was not selected for the shift, he or she may nonetheless have been recorded as a "no show" for the shift.

### G. Stryden's Assignment And Overtime Practices Were Used To Discriminate Against African-Americans

71. African-American Driver were told that it was the policy of Stryden not to offer overtime to Drivers. Nonetheless, Hispanic Drivers were regularly given overtime opportunities that were denied to blacks.

72.     African-Americans were offered the least desirable and more difficult jobs, such as working the car wash or in the National parking lot moving cars from one parking location to another.

73.     The practice of oversubscribing for shifts had a particularly pernicious impact upon African-American as their numbers dwindled and Caucasian Hispanic employees began to dominate the work force.

74.     The "first come, first served" protocol was enforced by Lead Drivers who, in most cases, would determine the order in which drivers arrived and would make the final selections as to who would participate on a shift.  However, as the number of African-American Lead Drivers decreased and the number of Hispanic Lead Drivers increased, the Hispanic Lead Drivers favored Hispanic Drivers over African-American Drivers.

75.     If a placement was still available, a Hispanic Lead Driver would assign the opening to a Hispanic, no matter how much earlier one or more African-American Drivers scheduled for the same shift may have arrived.

76.     As this problem became more pronounced, blacks could only get assignments when there were an insufficient number of Hispanics available to fulfill the requirements. Rather than competing for all 6 to 12 positions available on a shift, African-Americans were forced to compete against each other for the one or two positions that might remained after all available Hispanics had received their assignments.

77.     As a practical matter, this meant that African-American Drivers had to arrive earlier and earlier to secure an assignment that had already been given them, while the prospects for actually receiving an assignment substantially decreased..

78.     This type of arbitrary and systematic denial of equal work opportunities based solely on race contributed to the creation of a hostile work environment.  African-Americans

knew that if they protested this treatment, it would simply accelerate their departure because the new management would retaliate against anyone who protested by fabricating a justification to terminate them.

79.     At the same time the loss of assignments and related employment opportunities based solely on racial considerations made it impossible for African-Americans to receive sufficient compensation to continue working when they were routinely and arbitrarily denied the fundamental emoluments of employment that were made available to their Hispanic counterparts because of the difference in their race, color, national origin, and ethnicity. In contrast to the Hispanics with whom they competed, overtime opportunities were not made available, they were scheduled for shifts with less frequency, when they were scheduled for shifts they were far less likely to actually perform the shift they had been called to perform, they received no compensation for their "waiting time", they were far more likely to be terminated or terminated for unjustifiable reasons, and each knew that no matter how well they performed or how great their contribution it was inevitable that they were going to be arbitrarily terminated without justification because of their race.

## V.     PLAINTIFFS THEORY OF THE CASE

### A.     Discrimination Claims

#### 1.     Color, Race, National Origin, and Ethnicity Claims

80.     Individual Plaintiffs have asserted discrimination claims on behalf of themselves and a  Rule 23 Class of similarly situated SPC workers and applicants for employment  against Stryden, acting alone or in concert with Novos and/or ("MLL"), in its capacity as a single employer, joint employer, or co-employer, for the systematic pattern and practice of race, color, national origin, and/or ethnic discrimination described in this First Amended Class Action Complaint under § 1981 of the Civil Rights Act of 1866 ("Section 1981"), Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"); as amended by the Civil Rights

Act of 1991, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et. seq.* for

individual and class-wide injunctive relief and for compensatory damages and punitive damages.

81.     Individual Plaintiffs Badger, Mitchell, and Cambridge have dual filed charges of

discrimination with the Equal Employment Opportunity Commission ("EEOC") and the

Pennsylvania Human Relations Commission("PHRC"). Badger has received a "Right To Sue

Letter" from the EEOC.

82.     Mitchell and Cambridge have not yet received a "Right To Sue Letter" because

their consolidated charge, filed in January 2010, has been pending for an insufficient period of

time for it to become jurisdictionally ripe. Plaintiffs, Thomas, Hardy, Carter, Abdul-Karim,

Johnson, Shorts, Jackson, Kennedy, Horton and Hemmingway have not yet filed charges of

discrimination with the EEOC or the PHRC but plan to do so in the near future.

83.     On behalf of the Plaintiffs who have filed charges that are not yet jurisdictionally

ripe, plaintiffs who will file charges with the EEOC in the near future, and class members who

may file charges in the future with the EEOC or the PHRC, counsel hereby place the Court and

the parties on notice that as soon as sufficient time has passed for them to request and receive a

"Right to Sue Letter", they intend to seek leave to file an amendment of any then pending

complaint to assert additional claims under Title VII once they become jurisdictionally ripe.

84.     Plaintiffs can establish liability for discrimination based on a disparate treatment

theory because Stryden, acting alone or in concert with Novos and/or MLL, engaged in

intentional discrimination.

85.     Plaintiffs can establish liability for discrimination based on a disparate impact

theory because the procedures, standards, methods, techniques, and process used for the

recruitment, hiring, selection, discipline, and termination of employees and/or purported

independent contractors had a highly adverse impact upon African-Americans, which was not justified by any corresponding business necessity.

### 2.    Relationship Between Individual And Class Discrimination Claims

86.    This proceeding must be conducted in two distinct phases.  In Phase I, the Jury must address the question as to whether Stryden, acting alone or in concert with others, engaged in a "pattern and practice of discrimination."  Fed. R. Civ. P, 23(c)(4) provides that an action "may be brought or maintained as a class action with respect to particular issues."  The "pattern and practice" question raises a discrete issue that applies across the board to a cohesive class.

87.    If this question is answered in the affirmative, in Phase II, the so called "remedial phase" of the proceeding, each class member in presenting his or her individual claim will be aided by the presumption of discrimination that flows from a finding that the employer or contractor has engaged in a "pattern and practice" of discrimination.

88.    In these circumstances, the SPC claimants, aided by a "presumption of discrimination", which places the burden on the employer to prove by a preponderance of the evidence that the claimant was not injured due to discrimination, may recover individual injunctive relief in the form of back pay and front pay, as well the compensatory and punitive damages that are available in a Title VII, 1981, or PHRC discrimination case, as well as the payment of attorneys fees.

89.    The Court will also be authorized to enter class-wide injunctive relief in the form of an order that is designed to correct and assure that the unlawful acts committed by the defendants do not recur.

90.    To the extent the proofs show that Stryden has a national policy of segregating employees and or independent contractors on the basis of race, color, national origin, ethnicity or other unlawful criteria (e.g., age), and the pattern and practice of discrimination that exhibited

itself in Philadelphia in connection with the administration of the SPC was a bi-product of an overarching national policy and practice of segregation based on Title VII and 1981 prohibited considerations, the Class is entitled to nationwide injunctive relief in order to obtain full relief from the unlawful conduct to which they were subjected in Philadelphia.

91.    The issue of whether Stryden has engaged in a national pattern of practice of discrimination pursuant to a national policy of employment segregation based on race, color, ethnic, religion, national origin, or other unlawful consideration for purposes of rendering injunctive relief should be decided at the Phase 1 stage of these proceedings.

92.    Similarly, a declaration that the SPC Drivers and Lead Drivers were not "independent contractors" is a common issue that binds a cohesive class that should be addressed and resolved during the Phase I proceeding.

### 3.    The Badger Age Claim

93.    The mission of the Badger age claim is to resurrect the *Caldwell* case on behalf of himself because he was foreclosed from participation in the *Caldwell* case and on behalf of similarly situated older African-American Drivers and LDs who worked for Tandem but were not hired by Stryden who were not afforded the opportunity to participate in the *Caldwell* case.

94.    Badger brings his age claim under the ADEA**,** 29  U.S.C. § 621, as a Collective Action pursuant to 29 USC § 216(b), and the PHRA, 43 P.S.§ 951, *et.seq,* as a Rule 23 Class Action.

95.    Since the statute of limitations was tolled from the date, *Cardwell* filed a charge of age discrimination on December 12, 2006 on behalf of himself and others who are similarly situated until October 6, 2009, the date upon which the *Caldwell* case was dismissed with prejudice, Badger's claims are not time barred, Badger reserved his rights by dual-filing a charge of discrimination that identified age as the basis for discrimination against Stryden with the

EEOC and the PHRC in May 2009. In view of the impact of the tolling which Caldwell's charge and subsequent lawsuit had on the calculation of the limitation period, any other similarly situated class member who was rejected by Stryden in the November 2006 timeframe would still have approximately 80 days to file a charge with the EEOC before the 300-day filing period exhausted itself.

96.     Badger has limited his representation to black and/or African-American employees because neither he nor his counsel want to do anything that would suggest a conflict, whether actual or perceived, between the Rule 23 Class of blacks and African-Americans who were let go or not hired due to Stryden's plan to eliminate African-Americans and the simultaneous representation of non-African-Americans who may have been competing for similar jobs with class members.

97.     Plaintiffs will seek a Phase I Certification of the case as a Collective Action and Court approval of the notice to be sent to each member of the Collective Class notifying each former older African-American Tandem Driver who was not offered a position by Stryden of the proceeding and the ADEA issues raised in the proceeding, and his or her right to "opt in" to the collective action. Counsel will seek an Order from the Court requiring Stryden, Novos, and MLL to produce the last known address of each older African-American Driver who was not offered an opportunity to work for Stryden so that notice can be sent to each member of the collective class. Badger's protocol for presenting his age case under the PHRA can follow the same protocols that applied to the race, color, national origin, and ethnic discrimination claims. *See*, First Amended Complaint, ¶¶80-82.

### B.      The FLSA Unpaid Wages and Overtime Claims

98.     The FLSA Plaintiffs have instituted these proceedings on behalf of themselves and other similarly situated African-American Drivers to recover unpaid wages, unpaid overtime

wages, liquidated damages, and attorneys fees and to obtain appropriate injunctive relief in a

Collective Action brought pursuant to § 216(b) of the FLSA.

99. Since the time spent waiting to secure a position for a shift to which a Driver had

already been notified he was assigned was incurred solely at the request and for the convenience

and benefit of their employer, the FLSA plaintiffs are entitled to compensation for the "waiting

time." Stryden oversubscribed for each shift in order to assure their customer, National/Alamo,

that there would be no shortages of Drivers. Plaintiffs could not have secured employment

without spending this additional time at the site. To the extent the Driver worked less than a

total of 40 hours for the week, including any time for which he was not compensated, each

Driver should have been compensated for each hour actually worked at the hourly rate he

regularly received for the performance of similar work.

100. To the extent inclusion of this additional time caused the total hours the Driver

worked in a particular week to exceed 40 hours in total, in addition to the compensation for

working the additional time at his regularly hourly rate, he is entitled to a payment of one and a

half times his or her normal hourly rate for each hour over 40 that he worked in a particular week

as unpaid overtime compensation.

101. FLSA Plaintiffs are entitled to the payment of liquidated damages in an amount

equal to the sum of unpaid wages plus the amount of unpaid overtime wages.

102. Stryden failed to maintain accurate records of the time FLSA Plaintiffs actually

arrived for work when it was spent as "waiting time" to secure an assignment for a shift that had

already been reserved for the Driver, nor were the records of time taken for lunch accurately

maintained. *See*, 29 CFR 516.2(a)(7).

103. Stryden's violations of the FLSA were willful as evidenced by its knowledge and

oversight of the procedures used to select Drivers for shifts, its knowledge of its failure to

maintain accurate records as to when employees actually arrived, and its efforts to circumvent

liability under the FLSA by falsely claiming the Drivers were "independent contractors."

104.    Plaintiffs will seek a Phase I Certification of the case as a Collective Action and

Court approval of the notice to be sent to each member of the Collective Class, notifying each

former Driver of the proceeding and the FLSA issues raised in the proceeding, and his or her

right to "opt in" to the collective action.  FLSA Plaintiffs will seek an Order from the Court

requiring Stryden, Novos, and MLL to produce the last known address of each African-

American Driver so that notice can be sent to each member of the collective class.

105.    If the Court has not already previously determined the issue as a matter of law in

advance, Plaintiffs intend to seek a Declaration during the Phase 1 proceedings of the pattern and

practice of discrimination claim that plaintiffs and class members are employees rather than

independent contractors.  Any conclusion in this regard would apply with equal force to the

FLSA claim.

106.    Plaintiffs do not seek nor purport to represent Drivers or LDs who are not black

and/or African-American.  Because of the conflict between African-American and Hispanic

Drivers and LDs that lies at the heart of this case, counsel believes that the representation of

Hispanic Drivers in the FLSA claim may create a conflict in the Rule 23 Class discrimination

claim because of the conflict between black African-American and Caucasian Hispanics that lies

at the heart of the discrimination claim that could engender questions regarding the adequacy of

representation in the Rule 23 discrimination claim.

### C.    Liability Between and Among The Corporate Defendants

107.    Plaintiffs believe any claim made by Stryden that the Individual Plaintiffs or class

members are "independent contractors" is a sham and a fraud and merely provides direct

evidence of Stryden's chicanery.  On the other hand, even if Stryden were to prevail on the

"independent contractor" defense, while it would foreclose Title VII and FLSA claims, it would have no impact on the § 1981 or PHRA discrimination claim which are available to "independent contractors" as well as employees.

108.     Stryden has been joined as plaintiffs "employer", and to the extent only § 1981 or the PHRA remained viable, as plaintiffs' contractor.  Novos and MLL have been joined solely because they wrote, at different points in time, the paychecks paid to plaintiffs for the services rendered on the SPC.  Accordingly, Stryden may have acted alone in perpetrating a pattern and practice of discrimination, in which case it would be solely liable for the injuries that have been incurred, or to the extent it acted in concert with Novos or MLL, it may be jointly or severally liable with one or more of the defendants for the injuries incurred.

109.     Other than the receipt of paychecks, class members had no contact with anyone in the course of carrying out their duties who purported to be a representative of Novos or MLL.  Furthermore, Stryden was at all times represented as the party responsible for carrying out the SPC contract with National and Alamo by the management of Stryden as well as the management of National and Alamo to the SPC employees.  To the extent all employment decisions were made by Stryden, including those made by Stryden but carried out by Novos or MLL as instrumentalities of Stryden, Stryden would be responsible for all the injuries incurred by the individual plaintiffs and the Class.  In these circumstances, Stryden's dominance of its subsidiaries and affiliated companies resulted in Stryden, Novos, and MLL conducting themselves as a *de facto* unitary company under the control of Stryden, and it would therefore be appropriate to "pierce the corporate veil" and treat all three companies as a single company or as a joint employer.

110.     On the other hand, if Stryden contends, and the evidence shows, that Novos or MLL independently contributed to and in fact caused any of the unlawful employment decisions

for which this Amended Complaint seeks relief to have been made, Novos and/or MLL may be liable or jointly and severally liable with Stryden for the injuries incurred by plaintiffs and the class.

111.     As alleged above, MLL appears to have been created for the express purpose of aiding and abetting Stryden to evade its obligations under Title VII, the FLSA, and applicable tax law by facilitating Stryden's ability to advance the false proposition that the SPC Drivers and LDs were "independent contractors."  Accordingly, Stryden should be held liable for any deficiency from a judgment rendered against MLL since the entire rationale for MLL's existence was to aid and abet the legal violations contested in this First Amended Complaint.

112.     The participation of Novos and Stryden are necessary to afford complete injunctive relief in this case.

## VI.     RULE 23 CLASS ACTION ALLEGATIONS

113.     Plaintiffs bring this action individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and in a representative capacity on behalf of a class of all black and African-American retained to work on the SPC, or who applied for work on the SPC from June 1, 2008 until the present, most, if not all, of whom served or applied for positions as Drivers and Lead Drivers (hereafter referred to as "Class I").

114.     Plaintiff Badger brings this action individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and in a representative capacity on behalf of a class of all black and African-American older Drivers and LDs who were formerly employed by Stryden's predecessor, Tandem, and in November 2006 were not offered the opportunity to continue their prior jobs with Stryden after Stryden took over the Tandem PAR contract (hereafter referred to as "Class II").  The Rule 23 age claim arises under and the PHRA, 43 P.S. § 951, *et.seq*.

115.    Solely for purposes of national injunctive relief, a Class shall consist of all past, current, and future black and/or African-American Drivers and LDs retained by Stryden in any region or location within the United States, whether Stryden is acting alone, or in concert with Novos or MLL ("Class III").

116.    One or more Individual Plaintiffs are members of each Class sought to be represented.

117.    The members of each proposed Class are so numerous that joinder of all members is impracticable.  It is believed by Plaintiffs that Class I numbers in the range of 60 to 120 African-American employees who actually worked on the SPC.  It is impossible to estimate the number who applied for employment since that information is exclusively in the custody and control of the defendants.  However, based on past practice and experience, plaintiffs believe, and therefore aver, that that number would fall into the range of 60 to 120 applicants for employment.

118.    Badger lacks knowledge of information as to the total number of Tandem Class II employees not offered employment by Stryden in November 2006.

119.    Plaintiffs have no precise knowledge as to the number of Class III past, current, or future black and/or African-American Drivers or LDs  who have been or may be employed by Stryden across the nation in the future, or who have applied for or may apply for employment in the future with Stryden or its affiliates, Novos or MLL, for positions as Drivers or LDs.  Upon information and belief, plaintiffs aver that on a national basis, the number is likely to exceed 2,000.

120.    There are questions of law or fact common to all of the Classes and to each distinct Class, including, without limitation:

A)      whether Stryden, either separately or in concert with defendants Novos and MLL, engaged in a pattern and practice of discrimination by adopting and then implementing a policy and plan to eliminate all black and/or African-American workers from the SPC and replace them with Caucasian Hispanics;

B)      whether Stryden, either separately or in concert with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, refused to hire or consider blacks and/or African-Americans as candidates for employment for work to be performed on the SPC;

C)      whether Stryden, either separately or in concert with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, systematically discriminated against blacks by engaging in unjustified discipline and terminations against blacks and/or African-Americans;

D)      whether Stryden, either separately or in concert with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, systematically discriminated against blacks and/or African-Americans by engaging in common ongoing discriminatory practices in regard to promotions, the payment of wages and compensation, work assignments, and the scheduling of shifts;

E)      whether Stryden, either separately or in concert with one or more of its affiliates, as part of the plan to eliminate all blacks and African-Americans from the SPC and to avoid obligations under the FLSA and Title VII as well as the payment of payroll taxes, unjustifiably claimed that all Drivers and LDs were independent contractors;

F)      whether Stryden, either separately or in concert with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, engaged in intentional discrimination that constituted disparate treatment;

G) whether Stryden, either separately or in concert with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, used and implemented policies and practices that had an adverse impact upon the plaintiffs and the Class, and, if so, whether this impact is justified by business necessity;

H) whether Stryden's plan to eliminate all blacks and African-Americans from the SPC in the Philadelphia/Mid-Atlantic market, was part of a larger nationwide company policy to segregate employees and/or independent contractors on the basis of race, color, national origin, ethnicity, religion, or age and to employ or hire employees belonging only to one group at a particular location (e.g., workers on the Minnesota contract were predominantly Muslim; only blacks worked in the Philadelphia contract prior to July 2008, who were in turn replaced by Caucasian Hispanics after July 2008 (older workers systematically eliminated from contract in November 2006);

I) whether the inclusion of members from only one ethnic group at a particular location resulted from a policy of delegating unreviewable discretionary authority to members of a particular ethnic group who were given no clear standards or procedures for making selections, who in turn abused their discretion and violated the law by unjustifiably terminating everyone who did not belong to their ethnic group, and refusing to hire anyone who was not a member of their ethnic group;

J) whether blacks and African-Americans, as part of the plan to eliminate them, were denied equal work opportunities by forcing them to wait longer to be selected for participation on a shift than their similarly situated Hispanic counterparts who could show up for a job at the last minute and be selected over an African-American who waited hours for the shift because of the ethnic affinity that existed between the Hispanic Lead Driver who made the selection and the Hispanic Driver who appeared for the shift, which practice resulted in African-

Americans steadily losing actual employment opportunities while having to drive to work and spend many hours on the job for which they received no compensation;

K)    whether Stryden, either separately or in conjunction with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, subjected black and African American employees to a hostile work environment;

L)    whether Stryden, either separately or in conjunction with defendants Novos and MLL, as part of the plan to eliminate all blacks and African-Americans from the SPC, engaged in retaliation against Class members;

M)    whether statistics will show that Stryden, either separately or in conjunction with its affiliates, has engaged in a pattern and practice of discrimination; and

N)    whether Stryden engaged in a pattern and practice of age discrimination by refusing to consider older African-American workers who formerly worked for Tandem as candidates for employment with Stryden when such opportunities were automatically made available for younger Drivers and LDs who were formerly employed by Tandem;

121.    Plaintiffs' claims are typical of the claims of the members of all the Classes and of each Class. One or more of the Individual Plaintiffs have been subjected to each form of the discriminatory common operating policies and practices and hostile work environment caused by defendants. The policies and practices complained of in this Amended Complaint affect the entirety of each Class.

122.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes and of each Class. Plaintiffs have no conflict with the Classes and of each Class. Plaintiffs have retained counsels who are experienced in class action litigation and cases of this nature.

123. This action is properly maintainable under Rules 23(b)(2) and/or (b)(3) because: a) Stryden and its affiliates, Novos and MLL, have maintained an ongoing pattern and practice of discrimination on the basis of race, color, and ethnicity and the creation of a hostile work environment thereby acting or refusing to act on grounds generally applicable to each Class, making appropriate final injunctive or declaratory relief with respect to each Class as a whole; and b) questions of law and fact common to the Classes and each Class predominate over any questions affecting only individual members.

124. A class action is superior to other available methods for the fair and efficient adjudication of this case. A class is the superior mode of adjudication because in the absence of Rule 23 certification and notice, a substantial component of the class would have no way of knowing that their rights had been violated and thus Rule 23 provides the only avenue through which the rights of putative class members may be preserved and ultimately vindicated.

## VII. COLLECTIVE ACTION ALLEGATIONS

### A. Unpaid Wage And Overtime Claims

125. This action is brought by the FLSA Plaintiffs as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves individually and in a representative capacity on behalf of all similarly situated blacks and/or African-Americans who served as Drivers on the SPC at any time within the limitation period to recover unpaid wages, minimum wages, overtime compensation, liquidated damages, statutory penalties and damages, and attorneys fees.

126. FLSA Plaintiffs will execute FLSA 216(b) Consent To Be Party in FLSA Case forms with the Court in the near future.

127. The Plaintiffs estimate that there are anywhere from 60 to 100 similarly situated black and/or African-American class members who worked as Drivers on the SPC. The precise number and the identity of the specific individuals who should be given notice of their right to

"opt-in" into this collective proceeding may be determined from the defendants' records. Potential opt-ins may be given notice of this proceeding by US mail, publication of the notice at the worksite and elsewhere, and by e-mail.

128. The FLSA Plaintiffs do not seek nor purport to represent Drivers who are not black and/or African-American, and in particular do not represent Caucasian and/or Hispanic Drivers. This limitation is necessary in order to avoid any actual or perceived conflict of interest which may infringe upon the ability of the FLSA Plaintiffs to serve as adequate representatives for the Class under Rule 23 in regard to the discrimination claims. To the extent Hispanic or Caucasian Drivers, or Drivers belonging to any other ethnic group wish to raise similar claims, they are at liberty to pursue their own claims and may represent any Driver who opts-in and consents to their representation.

129. Pursuant to 29 U.S.C. §216(b) of the FLSA, plaintiffs seek a declaration that they may pursue their claims as a Collective Action and that plaintiffs shall be given leave to send a class-wide court supervised notice to current and former black and African-American employees that they may "opt-in" to this collective proceeding in order to recover unpaid wages, minimum wages, overtime compensation, liquidated damages, statutory penalties and damages, and attorneys fees for willful violations of the FLSA.

130. FLSA Plaintiffs are similarly situated to other Drivers who provided services for the SPC because the FLSA Plaintiffs and the Drivers they seek to represent all worked for the same managers at the same job site, performed precisely the same jobs, used the same facilities and equipment, were paid the same wages, and were subject to the same policies, procedures, and protocols.

131.    Stryden, in conjunction with Novos, who were aided and abetted by MLL,

engaged in willful violations of the FLSA, thus making the imposition of liquidated damages

appropriate.

## B.    Badger ADEA Claim

132.    Plaintiff Badger, pursuant to the ADEA, 29  U.S.C. § 621 *et.seq* and the

29 U.S.C.§ 216(B) FLSA collective action enforcement provisions, which the ADEA borrows

from the FLSA, has brought this claim to recover back pay, front pay, liquidated damages,

appropriate injunctive relief, and attorneys fees for defendants' willful violations of the ADEA

on behalf of himself and in a representative capacity on behalf of a class of all black and African-

American older Drivers and LDs who were formerly employed by Stryden's predecessor,

Tandem, who in November 2006 were not offered the opportunity to continue their prior jobs

with Stryden after Stryden took over the Tandem PAR contract.

133.    Badger has executed a form for FLSA 216(b) Consent To Be Party In ADEA

Case, which is  attached to this First Amended Complaint as Exhibits "A."

134.    Badger does not know the precise number of older African-American Drivers

who were not offered an opportunity by Stryden, and the identity of the specific individuals who

should be given notice of their right to "opt-in" into this collective proceeding must be

determined from the records of National, Tandem, and Stryden.  Potential opt-ins may be given

notice of this proceeding by US mail, publication of the notice at the work site and elsewhere,

and by e-mail.

135.    Badger does not seek nor purports to represent Drivers who are not black and/or

African-American and, in particular, does not represent Caucasian and/or Hispanic Drivers for

the same reasons FLSA Plaintiffs do not represent anyone who is not African-American.  *See*,

¶ 114, supra.

136.    In accordance with the ADEA and 29 U.S.C. §216(b) of the FLSA, plaintiffs seek a declaration that they may pursue their claims as a Collective Action and that plaintiffs shall be given leave to send a class-wide court supervised notice to former black and African-American employees of Tandem who were not invited to join Stryden in November 2006 so that they may "opt-in" to this collective proceeding in order to recover or obtain back pay, front pay, liquidated damages, injunctive relief, and attorneys fees for defendants willful violations of the ADEA.

137.    Badger is similarly situated to other Tandem Drivers and LDs who were not offered jobs by Stryden because all of them are former Drivers for Tandem, all of them were denied the same opportunity in the same context in or about November 2006 to work for Stryden for the same reasons based on decisions made by the same Stryden management team under common selection procedures, and all of them never learned about the *Caldwell* claim and failed to receive notice of it for the same reasons..

## VIII.    FACTS OF INDIVIDUAL CLAIMS

### A.    Cornelius A. Badger, Jr.

138.    Badger is a 52-year-old black African-American male.  He was employed by Stryden's predecessor, Tandem, and when Stryden made automatic offers of employment to all of the younger Drivers and LDs who previously worked for Tandem when it took over the PAR contract in November 2006, it declined to make an offer to Badger and other similarly situated Drivers and LDs when it took over the Tandem contract.

139.    After the *Caldwell* age discrimination suit was filed in December 2006, Badger applied for a position with Stryden in the fall of 2007 and was offered a position as a Driver.

140.    The application process for the job was perfunctory.  Badger showed that he had a valid driver's license and represented that he had a clean driving record.  After conducting a

search of his driving record, the African-American manager who hired him offered him a position within an hour after he had submitted his application.

141.    Badger had no legitimate blemishes on his record during his tenure, was regularly on time, never had an accident for which Stryden believed he was at fault, accrued no driving violations, and always delivered his vehicles safely.  He was paid $7.50 an hour for his services.

142.    After the Krempa/Rivera team was in place by the fall of 2008, Badger observed an immediate thrust to replace African-Americans with Hispanics.  Prior to their arrival, Badger estimates that the Driver/Lead Driver work force was 85% to 90% black and/or African-American, and it was vastly reduced before his departure.

143.    Badger was terminated as an SPC Driver in February 2009.  No explanation was offered for this decision.  He was simply told by Krempa that his name "was no longer on the list."

144.    Badger was hired as an employee of Stryden.  Until the fall of 2008, his paychecks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was required to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.  Notwithstanding these changes, absolutely nothing changed in terms of the reality of Badger's daily employment situation.  As in the past, he continued to report to work at the trailer on the National parking lot or at National's airport office, worked the shifts as designated by Stryden management, made car deliveries in accordance with their instructions and directions, and worked the precise hours they designated.  His employment relationship was for an indefinite period of time, and he had no contract with Stryden or MLL stating that he was an "independent contractor" nor specifying his

obligations or the requirements he had to meet.  He made no investment in the business, was paid on the basis of a regular hourly wage rate of once a week, made no "profit or loss", and all the materials and equipment needed to perform his job (gas and the vehicle) were supplied by Stryden.  If he failed to perform to expectation, he was subject to discipline by Krempa and Rivera, both of whom represented themselves as mangers and agents of Stryden.  The management of National and Alamo at all times referred to Krempa and Rivera as managers and agents of Stryden.

145.    Apart from the payroll checks Badger received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

146.     Badger was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Complaint.

147.    Badger was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

148.    Shortly after his termination, Badger filed a charge of discrimination with the EEOC asserting race and age discrimination claims, has received a right to sue letter, and filed suit in this court within 90 days of receiving the right to sue letter.

149.    Badger has incurred loss of back pay and front pay as result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorney's fees and costs.

## B.    Maverick Mitchell

150.    Mitchell is a 52-year-old black African-American male.  He was hired by Stryden as an employee in the spring of 2008.  His interview for the job was perfunctory.  He showed that he had a valid driver's license and a clean driving record.   His interview was conducted by a woman named Stephanie.  After conducting a search of his driving record, an African-American manager offered him a position as a Driver within hours after he initially submitted an application.

151.    Mitchell had no legitimate blemishes on his record during his tenure; he was regularly on time, had a single driving violation which occurred within a month after he was first hired, never had an accident, and always delivered his vehicles safely.  He was paid $7.25 an hour for his services.

152.    Mitchell was terminated as an SPC Driver in September 2009.  No credible explanation was offered for this decision.  He was the last black or African-American to work on the SPC as a Driver.  Based on the observation of others who have reason to return to the work site, Mitchell believes, and therefore avers, that Stryden has neither hired nor employed any black and/or African-American Drivers or LDs since he left the company in September 2009.

153.    After the Krempa/Rivera team was in place by the fall of 2008, Mitchell observed an immediate thrust to replace African-Americans with Hispanics.  Prior to their arrival, Mitchell estimates that the Driver/ Lead Driver work force was 90% to 95% black and African-American. It was reduced to zero at the time of his departure, which was within 12 months of Rivera's arrival.

154.    Mitchell was hired as an employee of Stryden.  Until the fall of 2008, his pay checks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter

drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2. He was required to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.

155. Notwithstanding these changes, absolutely nothing changed in terms of the reality of Mitchell's daily employment relationship with Stryden. In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Mitchell as it did Badger. *See*, First Amended Class Complaint ¶¶ 60-62 and 144.

156. Apart from the payroll checks Mitchell received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

157. Drivers such as Mitchell were not necessarily guaranteed an assignment because they showed up in time to work the shift for which they had been selected. As described above, Stryden routinely oversubscribed for a shift in order to assure that its customers requirements would be fulfilled and used the "first come, first served" protocol to determine which Drivers would be assigned a shift in the event there were more Drivers than slots available. *See*, First Amended Class Complaint ¶¶ 67-69.

158. If the waiting time is included as compensable time, Mitchell regularly worked time for which he was not compensated, and to the extent inclusion of this "waiting time" meant that he worked more than 40 hours a week for which he received no compensation, he is entitled to overtime compensation for each hour over forty hours he worked in a particular week.

159. To the extent he worked more than forty hours a week, he is entitled to receive one and a half times his regular compensation or $10.88 ($7.25 + $3.63 = $10.88) plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred within the limitation period. To the extent he worked

hours without compensation during a week in which he worked less than a total of forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.25) plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

160.    As Hispanics gained dominance in the workplace, for the reasons explained above, Mitchell lost job opportunities made available to his Hispanic counterparts because he was not allowed to work overtime, he received fewer assignments, was more likely to have to wait longer without compensation for the assignments he was called into fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race, and ethnicity.

161.    Mitchell was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Complaint.

162.    Mitchell was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

163.    Mitchell has incurred loss of back pay and front pay as a result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorney's fees and costs.

### C.    Benton Cambridge, IV

164.    Cambridge is a 25-year-old black African-American male.  He was hired by Stryden as an employee in the spring of 2007.  His interview for the job was perfunctory.  He showed that he had a valid driver's license and a clean driving record.  After conducting a search

of his driving record, a Caucasian woman named Stephanie offered him a position as a Driver within hours after he initially submitted an application.

165.     Cambridge had no legitimate blemishes on his record during his tenure.  He was regularly on time, never had an accident, accrued no driving violations, and always delivered his vehicles safely.  He was paid $7.50 an hour for his services.

166.     Cambridge was terminated as an SPC Driver in March 2009.  No credible explanation was offered for this decision.

167.     After the Krempa/Rivera team was in place by the fall of 2008, Cambridge observed an immediate thrust to replace African-Americans with Hispanics.  Prior to their arrival, Cambridge estimates that the Driver/Lead Driver work force was at times as high as 98% of the total work force.  Only a handful of African-Americans remained by the time of his departure.

168.     Cambridge was hired as an employee of Stryden.  Until the fall of 2008, his pay checks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was required to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.

169.     Notwithstanding these changes, absolutely nothing changed in terms of the reality of Cambridge's daily employment relationship with Stryden.  In regard to all aspects of their relationship, Stryden continued to exercise the same degree of  "domination and control" over Cambridge as did Mitchell and Badger.  *See*, First Amended Class Complaint ¶¶ 60-62 and 144.

170.    Apart from the payroll checks Cambridge received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

171.    Drivers such as Cambridge were not necessarily guaranteed an assignment because they showed up in time to work the shift for which they had been selected.  As described above,  Stryden routinely oversubscribed for a shift in order to assure that its customers requirements would be fulfilled and used the "first come, first served " protocol to determine which Drivers would be assigned a shift in the event there were more Drivers than slots available.  *See*, First Amended Class Complaint ¶¶ 67-69.

172.    If the waiting time is included as compensable time, Cambridge regularly worked "waiting time" for which he was not compensated, and to the extent inclusion of this "waiting time" meant that he worked more than 40 hours a week for which he received no compensation, he is entitled to overtime compensation for each hour over forty hours he worked in a particular week.

173.    To the extent he worked more than forty hours a week he is entitled to receive one and a half times his regular compensation or $11.25 ($7.50 + 3.75 = $11.25) plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $22.50 for each hour of unpaid overtime incurred within the limitation period.  To the extent he worked hours without compensation during a week in which he worked less than a total of  forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.25) plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

174.    As Hispanics gained dominance in the workplace, for the reasons explained above,  Cambridge lost job opportunities made available to his Hispanic counterparts.  He was not allowed to work overtime, received fewer assignments, was more likely to have to wait

longer without compensation for the assignments he was called into fill or not actually used on

shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary

and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason

or invalid reasons because of his color, race, and ethnicity.

175.    Cambridge was personally subjected to the hostile racial environment described in

¶¶ 36-52 and 71-79 of this First Amended Class Complaint.

176.    Cambridge was never given any handbook, policy, or memorandum on how he

might request an internal investigation of any claim of discrimination or harassment he might

have, nor did the company offer any postings on this topic or provide any oral instructions.  It

lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

177.    Cambridge has incurred loss of back pay and front pay as a result of defendants'

violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an

award of attorney's fees and costs.

### D.    Gilbert Hardy

178.    Hardy is a 57-year-old black African-American male.  He is a former employee of

National and Tandem and was picked up by Stryden when it took over the contract for the PAR

in November 2006.

179.    Hardy had no legitimate blemishes on his record during his tenure.  He was

regularly on time, never had an accident, accrued no driving violations, and always delivered his

vehicles safely.  He was paid $7.50 an hour for his services.

180.    Stryden terminated his employment in April 2009 by refusing to give him

sufficient work to earn a living.  As a Driver for National, Tandem, and Stryden prior to the

arrival of the Krempa/Rivera Management team, Hardy regularly worked five shifts a week.

Shortly after Rivera's arrival, he began receiving an average of three shift assignments per week,

the equivalent of a 40% reduction in income.  This reduction was further aggravated by the fact that because of the ethnic preference Hispanic Lead Drivers gave other Hispanics, he was less likely to actually receive an assignment he had been called to fill which resulted in the expenditure of time for which he was not compensated.  These developments reduced his income from this job to the point he could not make a living.

181.    Prior to the arrival of Krempa and Rivera, Hardy estimates that the Driver/Lead Driver work force for the SPC was 90% black and/or African-American.  Hardy observed that as soon as Rivera arrived, he stopped hiring African-Americans; only Hispanics were hired to replace African-Americans who had been forced to leave, and it was apparent to him that it was Rivera's intention to eliminate all of the African-American Drivers and LDs,

182.    Hardy was hired as an employee of Stryden.  Until the fall of 2008, his paychecks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was asked to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes but declined to do so.

183.    Notwithstanding these changes, absolutely nothing changed in terms of the reality of Hardy's daily employment relationship with Stryden.  In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Hardy as it did Badger and others.  *See*, First Amended Class Complaint, ¶¶ 60-62 and 144.

184.    Apart from the payroll checks Hardy received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

185.    Drivers such as Hardy were not necessarily guaranteed an assignment because they showed up in time to work the shift for which they had been selected.  As described above, Stryden routinely oversubscribed for a shift in order to assure that its customers requirements would be fulfilled and used the "first come, first served" protocol to determine which Drivers would be assigned a shift in the event there were more Drivers than slots available.  *See*, First Amended Class Complaint, ¶¶ 67-69.

186.    If the waiting time is included as compensable time, Hardy regularly worked "waiting time" for which he was not compensated, and to the extent inclusion of this "waiting time" meant that he worked more than 40 hours a week for which he received no compensation, he is entitled to overtime compensation for each hour over forty hours he worked in a particular week.

187.    To the extent he worked more than forty hours a week, he is entitled to receive one and a half times his regular compensation or $11.25 ($7.50 + 3.75 = $11.25), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $22.50 for each hour of unpaid overtime incurred within the  limitation period.  To the extent he worked hours without compensation during a week in which he worked less than a total of  forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.50), plus payment of an equal amount in liquidated damages for a total of $15.00 per hour.

188.    As Hispanics gained dominance in the workplace, for the reasons explained above,  Hardy lost job opportunities made available to his Hispanic counterparts. He was not allowed to work overtime, he received fewer assignments, was more likely to have to wait longer without compensation for the assignments he was called into fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and

unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race and ethnicity.

189.    Hardy was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Complaint.

190.    Hardy was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

191.    Hardy has incurred loss of back pay and front pay as a result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorney's fees and costs.

### E.    Donald Thomas

192.    Thomas is a 51-year-old black African-American male.  He was hired by Stryden an employee in the fall of 2008, approximately two weeks in advance of the arrival of Rivera.  He was the last black and/or African-American to be hired as an SPC Driver or LD.

193.    His interview for the job was perfunctory.  He showed that he had a valid driver's license and a clean driving record.  After conducting a search of his driving record, he was offered a position as a Driver within hours after he initially submitted an application.

194.    Thomas had no legitimate blemishes on his record during his tenure.  He was regularly on time, never had an accident, accrued no driving violations, and always delivered his vehicles safely.  He was paid $7.50 an hour for his services.

189.    Thomas was terminated as an SPC Driver in February 2009.  No credible explanation was offered for this decision.

190.    After the Krempa/Rivera team was in place by the fall of 2008, Thomas observed

an immediate thrust to replace African-Americans with Hispanics.  Prior to Rivera's arrival,

Thomas' observation was that the Driver LD work force was predominantly African-American.

Upon his arrival, the facility was flooded with Hispanic applicants who were hired and began

replacing African-American incumbent Drivers.

191.    Most, and most likely all, of Thomas' paychecks were drawn on the account of

MLL.  His taxes were not withheld, and he received a 1099.   He was not asked to sign an

acknowledgement which stated that he understood that taxes had not been withheld and that he

had an obligation to pay his own taxes, nor did he execute any document which stated he was an

"independent contractor."

192.    All elements of Thomas' relationship with Stryden manifested the degree of

"domination and control" that typifies an employer/employee relationship rather than that of an

"independent contractor."  *See*, Amended Complaint ¶¶ 60-62 and 144.

193.    Apart from the payroll checks Thomas received, no one who purported to be

affiliated with Novos or MLL ever had any contact with him in the course of performing his

duties on the SPC.

194.    Drivers such as Thomas were not necessarily guaranteed an assignment because

they showed up in time to work the shift for which they had been selected.  As described above,

Stryden  routinely oversubscribed for a shift in order to assure that its customers requirements

would be fulfilled and used the "first come, first served" protocol to determine which Drivers

would be assigned a shift in the event there were more Drivers than slots available.  *See*,

Amended Complaint ¶¶ 67-69.

195.    If the waiting time is included as compensable time, Thomas regularly worked

"waiting time" for which he was not compensated, and to the extent inclusion of this "waiting

time" meant that he worked more than 40 hours a week for which he received no compensation, he is entitled to overtime compensation for each hour over forty hours he worked in a particular week.

196.    To the extent he worked more than forty hours a week, he is entitled to  receive one and a half times his regular compensation or $10.88 ($7.25 + 3.63 = $10.88), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred within the limitation period.  To the extent he worked hours without compensation during a week in which he worked less than a total of  forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

197.    As Hispanics gained dominance in the workplace, for the reasons explained above, Thomas lost job opportunities made available to his Hispanic counterparts.  He was not allowed to work overtime, he received fewer assignments, was more likely to have to wait longer without compensation for the assignments he was called into fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race, and ethnicity.

198.    Thomas was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Complaint.

199.    Thomas was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might have, nor did the company offer any postings on this topic or provide any oral instructions. It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

200.     In February 2010, Thomas, who has not been employed since his termination, obtained Rueben's telephone number, which is identified on the trailer located in the National Parking lot, and called him for the purpose of making arrangements for an interview for a job as a Driver.  Rueben expressed great concern about how Thomas got his number but agreed to meet with him.

201.     At the meeting, Rueben told Thomas that he was qualified for the job and that he would get back to him if an opportunity became available.  Thomas has received no follow-up calls.

202.     Thomas has incurred loss of back pay and front pay as result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorney's fees and costs.

## F.     Eric Carter

203.     Carter is a 40-year-old black African-American male.  He was hired by Stryden in November of 2006 when it first took over the PAR contract from Tandem.  At the time he was hired, he asked to serve as a Lead Driver.  No openings for Lead Drivers were immediately available, but he agreed to come on as a Driver with the understanding he would move to Lead Driver when an opening became available. An opportunity opened up three or four month after he came on board, and Carter worked as a Lead Driver until his termination.

204.     Carter had no legitimate blemishes on his record during his tenure, was regularly on time, never had an accident, accrued no driving violations, always delivered his vehicles safely, picked up and returned his crew of Drivers from the locations at which they made deliveries to their designated return point, and successfully performed all related administrative tasks.

205.     Prior to the arrival of the Krempa/Rivera team, Carter observed that more than 90% of the SPC Driver /LD work force was black and African-American, and immediately after their arrival, it became management's objective to replace the African-American work force with an Hispanic work force.

206.     In his capacity as a Lead Driver, Carter participated in the implementation process of the "first, come, first served" selection process used when shifts were oversubscribed and personally observed that this procedure worked to the grave disadvantage of African-Americans, who had to arrive earlier and were at increasingly high risk of not being selected at all for shifts they had been called upon to serve, once most of the Lead Drivers became Hispanic.

207.     As a Lead Driver, he received overtime opportunities but was in a position to observe that Hispanic Drivers received overtime but African-American Drivers did not.  Because he was a Lead Driver who selected shift participations, he never had to arrive early in order to secure his assignment on a shift.

208.     Carter was personally aware that Rivera hired Hispanics with criminal records who subsequently stole autos and GPS systems while turning down applications made by African-American police officers.

209.     Carter was terminated as an SPC Driver in the winter of 2009 for no credible reason.

210.     Carter was hired as an employee of Stryden.  Until the fall of 2008, his paychecks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was never asked to sign an acknowledgement which stated that he understood that taxes had not

been withheld and that he had an obligation to pay his own taxes, nor did he enter into any

agreement or sign any document suggesting he an independent contractor.

211.    Notwithstanding these changes, absolutely nothing changed in terms of the

reality of Carter's daily employment relationship with Stryden.  In regard to all aspects of their

relationship, Stryden continued to exercise the same degree of "domination and control" over

Carter as it did Badger and others.  *See*, First Amended Class Complaint, ¶¶ 60-62 and 144.

212.    Apart from the payroll checks Carter  received, no one who purported to be

affiliated with Novos or MLL ever had any contact with him in the course of performing his

duties on the SPC.

213.    Carter was personally subjected to the hostile racial environment described in

¶¶ 36-52 and 71-79 of this First Amended Class  Complaint.

214.    Carter was never given any handbook, policy, or memorandum on how he might

request an internal investigation of any claim of discrimination or harassment he might have, nor

did the company offer any postings on this topic or provide any oral instructions.  It lacked any

internal policies or procedures prohibiting or policing discrimination or harassment.

215.    Carter has incurred loss of back pay and front pay as result of defendants'

violations, and is entitled to compensatory damages, punitive damages, injunctive relief, and an

award of attorney's fees and costs.

### G.    Mikail Abdul-Karim

216.    Abdul-Karim is a 40-year-old black African-American male.  He was hired by

Stryden as an employee in the spring of 2008.  He made an appointment to interview with

Stephanie at the offices where Stryden was then located on the 3900 block of Chestnut Street in

West Philadelphia.  At the interview, he filled out an online application in  the presence of

Stephanie which asked him to identify his race.  At the interview, he showed he had a valid

driver's license and informed her that he had a clean driving record. Within 45 minutes of his arrival for the interview, he was offered a job conditioned upon the successful completion of a background review. The job offer was confirmed the next day, and he was hired at the rate of $7.25 per hour. At the conclusion of the interview, Stephanie gave him a vest with the Stryden logo on it.

217.    Abdul-Karim was initially assigned to the 3 to 11 shift. During the interview, Stephanie did not advise him of the need to arrive in advance of his shift in order to secure an assignment. The first two days, he arrived shortly in advance of the time the shift was scheduled to begin and received an assignment. On the third day, the van was full and the Lead Driver advised him that if he wanted to make sure he received an assignment when scheduled, he had to show up at least an hour in advance of the time the shift was scheduled to begin. He thereafter discovered that he needed to be available at least an hour and half in advance of the schedule in order to have a reasonable chance of receiving a shift assignment. In addition, the Lead Driver was often late, and 15 to twenty minutes would often be spent in trying to sort out who arrived at the earliest time.

218.    The clock did not start until the van left the premises.

219.    Even though Abdul-Karim made diligent efforts to appear at least an hour and a half in advance of the scheduled time for commencement of his shift, he was nonetheless sent home one to two times a week because the van was full with drivers who had arrived earlier. In addition, many of the shifts to which he was assigned did not work a full 8-hour shift (with one half hour off for lunch) so there were many shifts for which he received assignments but only logged 2 to 5 hours.

220.   As a consequence, Abdul-Karim received compensation for much less than the 37.5 hours of work he was promised when he took the job and was reduced to receiving compensation for 15 to 30 hours work week.

221.   Abdul-Karim regularly worked through or took no lunch period but nonetheless incurred deductions in his hours for lunch breaks that were not taken.

222.   After Rivera took over the problems, getting work intensified.  Rivera began scheduling Abdul-Karim for only two or three shifts a week.  After the Hispanic Lead Drivers began selecting the crews, it became close to impossible for him to be placed on a shift no matter how early he arrived because his Hispanic counter-parts were always selected in advance of him without regard to their relative time of arrival.

223.   Apart from the personal difficulties Abdul-Karim encountered in securing regular work he had no legitimate blemishes on his record during his tenure.  He was  regularly on time, never had an accident, accrued no driving violations, and always delivered his vehicles safely.

224.   Abdul-Karim was terminated as an SPC Driver in November 2008.  Rivera falsely told him he was terminated because Stryden was losing the National contract, and they did not need as many workers.  He indicated that he would be recalled when business picked up. This explanation was patently false because at the same time Rivera was feverishly hiring brand new  inexperienced employees.

225.   When Abdul- Karim began his employment with Stryden in April 2008, the  SPC Drivers and LD's were predominantly African-American. By the time he was terminated, it was apparent that the only employees being laid off were African-American, and the only employees being hired were Hispanic.

226.    Abdul-Karim was hired as an employee of Stryden.  Until  the fall of 2008 his pay checks were drawn on the account of Novos.  He received a W-2 form and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was required to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.

227.    Absolutely nothing changed in terms of the reality of Abdul-Karim's daily employment relationship with Stryden.  In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domnation and control" over Abdul-Karim as it did the other plaintiffs.  *See*, First Amended Class Action Complain ¶¶ 60-62 and 144.

228.    Apart from the payroll checks Abdul-Karim  received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

229.    Abdul-Karim seeks to recover the unpaid minimum wages and/or wages he was not paid for the "waiting time" waiting for disputes concerning who would be selected for the shift and unpaid lunch time he necessarily incurred in order to secure assignments from his employer.

230.    To the extent he worked hours without compensation during a week in which he worked less than a total of  forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

231.    As Hispanics gained dominance in the workplace, for the reasons explained above, Abdul-Karim lost job opportunities made available to his  Hispanic counterparts.  He was not allowed to work overtime, received fewer assignments, was more likely to have to wait

longer without compensation for the assignments he was called into fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race, and ethnicity.

232.    Abdul-Karim was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class and Collective Action Complaint.

233.    Abdul-Karim was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

234.    Abdul-Karim has incurred loss of back pay and front pay as result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorney's fees and costs.

### H.    Aaron Johnson

235.    Johnson is  a 37-year-old black African-American male.  He was hired by Stryden as an employee in the February/March time frame of 2008.  He made an appointment to interview with Stephanie at the offices where Stryden was then located on the  3900 block of Chestnut Street in West Philadelphia.  At the interview, he filled out an online application in the presence of Stephanie, which asked him to identify his race.  At the interview, he showed he had a valid driver's license and a clean driving record.  At the conclusion of the 45 minute interview, he was offered a job conditioned on the successful completion of a background search.  He was hired at the rate of  $7.25 per hour.  He was promised work five days a week.  He was assigned the 3pm to 11pm shift Monday through Thursday, and the 7am to 3pm Saturday shift.  Stephanie told him to arrive an hour before his shift was scheduled to begin.

236.     Johnson arrived an hour in advance of his scheduled shift but soon discovered this did not provide sufficient protection to assure him an assignment on the shift because he was still being sent home 2 or 3 days week.  He therefore began arriving an hour to an hour and a half in advance of the commencement of the shift.

237.     In the interview, Stephanie told him that he was eligible for and would receive overtime.  However, when he actually worked overtime, he was advised that it was Stryden's policy not to pay for overtime, and he was simply not paid for it.

238.     Despite his efforts to arrive well in advance of the commencement of the shift he was nonetheless regularly not selected  for driving assignments. When he received no driving assignment, he was offered the alternative of working the lot, which involved moving the car from one location to another on the lots, or at the car wash.  Even though he and other Drivers considered this a far less desirable assignment, he ended up working 2 to 3 days a week on the lot.

239.     When he worked the lot, lunch breaks were never taken.  On  days when he worked as a driver, lunch breaks were not taken on days when the drivers worked less than the full 8 hours or when there was insufficient time to complete delivery in less than 8 hours if a lunch break was taken.  Nonetheless, even though no lunch break was taken, Stryden regularly reduced hours for lunch breaks that were never taken, even in circumstances where the Lead Driver had certified no lunch break was taken.

240.     After Rivera took over, the problems getting work intensified.

241.     Rivera began scheduling him for fewer shifts, and he was far less likely to be selected for assignments by Hispanic Lead Drivers than his Hispanic counter-parts no matter how early he reported for duty.  As a consequence, his hours were reduced after Rivera's arrival.

242.     Johnson had no legitimate blemishes on his record during his tenure.  He was regularly on time, never had an accident, accrued no driving violations, and always delivered his vehicles safely.

243.     Johnson was terminated as an SPC Driver in or about April 2008**.**   Rivera falsely advised him that he was terminated because Stryden had to make layoffs for lack of work and that he would be contacted in the event their requirements returned.  This explanation was patently false because at the same time Rivera was still feverishly hiring brand new inexperienced Hispanic employees.

244.     When Johnson  began his employment with Stryden in the February/March 2008 time frame, the SPC Drivers and LD's were predominantly African-American.  By the time he was "laid off", it was apparent that the only employees being let go were African-American, and the only employees being hired were Hispanic.

245.     Johnson was hired as an employee of Stryden. Until the fall of 2008, his pay checks were drawn on the account of Novos.  He received a W-2 form, and his income taxes were withheld from his paycheck.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 in lieu of a W-2.  He was required to sign an acknowledgement which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.

246.     Absolutely nothing changed in terms of the reality of Johnson's daily employment relationship with Stryden.  In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Johnson as it did the other plaintiffs. *See*, First Amended Class Action Complaint ¶¶ 60-62 and 144.

247.    Apart from the payroll checks Johnson received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

248.    Johnson seeks to recover the unpaid wages, minimum wages and/or overtime wages he was not paid for the "waiting time", time spent selecting organizing the crew, and time worked during lunch breaks he worked but for which he received no compensation.

249.    To the extent he worked more than forty hours a week, he is entitled to receive one and a half times his regular compensation or $10.88 ($7.25 + 3.63 = 10.88), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred.  To the extent he worked hours without compensation during a week in which he worked less than a total of forty hours, for each unpaid hour he is entitled to compensation at his normal hourly rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

250.    As Hispanics gained dominance in the workplace, for the reasons explained above, Johnson lost job opportunities made available to his Hispanic counterparts.  He was not allowed to work overtime, received fewer assignments, was more likely to have to wait longer without compensation for the assignments he was called into fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race and ethnicity.

251.    Johnson was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Action Complaint.

252.    Johnson was never given any handbook, policy, or memorandum on how he might request an internal investigation of any claim of discrimination or harassment he might

have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal polices or procedures prohibiting or policing discrimination or harassment.

253.    John has incurred loss of back pay and front pay as a result of defendants' violations, and is entitled to compensatory damages, punitive damages, injunctive relief and an award of attorneys' fees and costs.

## I.    <u>Zakiyyah Jackson</u>

254.    Jackson is a 24-year-old African-American female.  She was interviewed for a half hour by a Caucasian female for a job as a Stryden Driver by a Caucasian woman whose name she does not recall in the summer of 2007.  She filled out an application online in which she was asked to identify her race.  She was offered a job on the spot subject to a background check by Stryden.

255.    She was offered no specific schedule and was given a different schedule for each day.  During the interview, no mention was made of any requirement to arrive before the shift actually started.  As a consequence, she was sent home and the Lead Driver told her she had to arrive before the shift actually began or she ran the risk of being sent home.  She began arriving 45 minutes before her shift began but was often denied work because others arrived before she did.

256.    When shifts were shortened from a full 8-hour shift (with a half hour for lunch) or when she was placed on a job that could not be completed in 8 hours if a lunch break was taken, a lunch break was nonetheless deducted from her chargeable hours even though no lunch break was taken, and even though the Lead Driver may have certified that no lunch break was taken.

257.    After Rivera took over, the problems getting work intensified.  Rivera began scheduling her for fewer shifts, and she was far less likely to be selected for assignments by

Hispanic Lead Drivers than her Hispanic counter-parts no matter who early she reported for duty. As a consequence, her hours were reduced after Rivera's arrival.

258.    Jackson had no legitimate blemishes on her record during her tenure. She was regularly on time, never had an accident, accrued no driving violations, and always delivered her vehicles safely.

259.    Jackson was terminated as an SPC Driver in the fall of 2008, approximately three weeks after Rivera arrived. Jackson was told that she was laid off because of a reduction in business and that she would be recalled if business returned to its former level. This explanation was patently false because at the same time Rivera was still feverishly hiring brand new inexperienced Hispanic employees.

260.    When Jackson began her employment with Stryden in the summer of 2007, the SPC Drivers and LD's were predominantly African-American. By the time she was "laid off," it was apparent that the only employees being let go were African-American, and the only employees being hired were Hispanic.

261.    Jackson was hired as an employee of Stryden until the fall of 2008. Her paychecks were drawn on the account of Novos. She received a W-2 Form, and her income taxes were withheld from her paycheck. However, in the fall of 2008, her checks were thereafter drawn on the account of MLL, her taxes were not withheld, and she received a 1099 Form in lieu of a W-2 Form. She was required to sign an acknowledgment which stated that she understood that taxes had not been withheld and that she had an obligation to pay her own taxes.

262.    Absolutely nothing changed in terms of the reality of Jackson's daily employment relationship with Stryden. In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Jackson as it did the other plaintiffs. *See*, First Amended Class Action Complaint ¶¶ 60-62 and 144.

263.    Apart from the payroll checks Jackson received, no one who purported to be affiliated with Novos or MLL ever had any contact with her in the course of her performing her duties on the SPC.

264.    Jackson seeks to recover the unpaid wages, minimum wages and/or overtime wages she was not paid for the "waiting time," time spent selecting and organizing the crew, and time worked during lunch breaks she worked but for which she received no compensation.

265.    To the extent she worked more than forty hours a week, she is entitled to receive one and a half times her regular compensation, or $10.88 ($7.25 + $3.63 = $10.88), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred.  To the extent she worked hours without compensation during a week in which she worked less than a total of forty hours, for each unpaid hour she is entitled to compensation at her normal hourly rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

266.    As Hispanics gained dominance in the workplace, for the reasons explained above, Jackson lost job opportunities made available to her Hispanic counter-parts.  She was not allowed to work overtime, received fewer assignments, was more likely to have to wait longer without compensation for the assignments she was called in to fill or not actually used on shifts she had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that she was ultimately going to be terminated for no reason or invalid reasons because of her color, race and ethnicity.

267.    Jackson was personally subjected to the hostile race environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Action Complaint.

268.    Jackson was never given any handbook, policy, or memorandum on how she might request an internal investigation of any claim of discrimination or harassment she might

have, nor did the company offer any postings on this topic or provide any oral instructions. It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

269.    Jackson has incurred loss of back pay and front pay as result of defendants' violations, and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorneys' fees and costs.

### J.    Quinton Kennedy

270.    Kennedy is an African-American male who was hired as an employee by Stryden as an employee in the spring of 2008. He was interviewed by Stephanie at the offices where Stryden was then located on the 3900 block of Chestnut Street in West Philadelphia. At the interview, he filled out a hard copy application in the presence of Stephanie which asked him to identify his race. At the interview, he was asked to show he had a valid driver's license and whether he had a clean driving record. At the conclusion of the 45-minute interview, he was offered a job, conditioned on a successful completion of a background search. He was hired at the rate of $7.25 per hour and promised work five days a week. He was assigned the 10:00 a.m. to 6:00 p.m. and 11:00 a.m. to 7:00 p.m. shifts. Stephanie advised him that he was required to report an hour before his shift was to begin in order to secure the assignment.

271.    After being sent home on several occasions because he arrived too late to secure an assignment on the shift, Kennedy began arriving an hour and a half in advance of the commencement of his shift.

272.    After Rivera took over, he began scheduling Kennedy for fewer shifts, and he was far less likely to be selected for assignments by Hispanic Lead Drivers than his Hispanic counter-parts no matter how much earlier he had reported for duty. As a consequence, it became more difficult to get work after Rivera's arrival.

273.    Kennedy had no legitimate blemishes on his record during his tenure.  He was regularly on time, never had an accident, accrued no driving violations, and always delivered his vehicles safely.

274.    Kennedy was terminated as an SPC Driver in or about November 2008.  Rivera placed a notice which stated that if "you were no longer on the list you were terminated."  Rivera told him he had been laid off because of lack of work and that he would be contacted in the event Stryden's requirements returned.  This explanation was patently false because at the same time Rivera was feverishly hiring brand new inexperienced Hispanic employees.

275.    When Kennedy began his employment with Stryden in the June 2008 time frame, the SPC Drivers and LD's were predominantly African-American.  By the time he was "laid off," it was apparent that the only employees being let go were "African-American," and the only employees being hired were Hispanic.  The SPC workforce was predominately African-American when he joined the company, and predominately Hispanic by the time he left.

276.    Kennedy was hired as an employee of Stryden.  Until the fall of 2008, his pay checks were drawn on the account of Novos.  He received a W-2 Form, and his income taxes were withheld from his check.  However, in the fall of 2008, his checks were thereafter drawn on the account of MLL, his taxes were not withheld, and he received a 1099 Form in lieu of a W-2 Form.  He was required to sign an acknowledgment which stated that he understood that taxes had not been withheld and that he had an obligation to pay his own taxes.

277.    Absolutely nothing changed in terms of the reality of Kennedy's daily employment relationship with Stryden.  In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Kennedy as it did the other plaintiffs.  *See*, First Amended Class Action Complaint ¶¶ 60-62 and 144.

278.    Apart from the payroll checks Kennedy received, no one who purported to be affiliated with Novos or MLL ever had any contact with him in the course of performing his duties on the SPC.

279.    Kennedy seeks to recover the unpaid wages, minimum wages and/or overtime wages he was not paid for, the "waiting time", time spent selecting and organizing the crew, and time deducted for lunch breaks for which no break was taken.

280.    To the extent he worked more than forty hours a week, he is entitled to receive one and a half times his regular compensation, or $10.88 ($7.25 + 3.63 = $10.88), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred. To the extent he worked hours without compensation during a week in which he worked less than a total of forty hours, for each unpaid hour he is entitled to compensation at his normal hour rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 an hour.

281.    As Hispanics gained dominance in the workplace, for the reasons explained above, Kennedy lost job opportunities made available to his Hispanic counterparts. He was not allowed to work overtime, he received fewer assignments, was more likely to have to wait longer without compensation for the assignments he was called in to fill or not actually used on shifts he had been notified to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race and ethnicity.

282.    Kennedy was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Action Complaint.

283.    Kennedy was never given any handbook, policy, or memorandum on who he might request an internal investigation of any claim of discrimination or harassment he might

have, nor did the company offer any postings on this topic or provide any oral instructions. It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

284.    Kennedy has incurred loss of back pay and front pay as a result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorneys' fees and costs.

### K.    Sabrina Shorts

285.    Shorts is a 25-year-old African-American female. She was hired by Stryden in the spring of 2008. She was interviewed and hired by Stephanie and filled out a hard copy application indicating she was African-American. Although she initially did some work as a Driver, she was sent home frequently because of her failure to arrive sufficiently in advance of the start of her shift.

286.    After July of 2008, she worked exclusively on the lot moving cars and cleaning them at the car wash. She got this job because none of the other drivers wanted to or were willing to do this type of work. She was paid $7.00 per hour.

287.    As a lot worker, she received regular assignments, worked 5 shifts a week for 8 hours a day as paid compensation. However, she also had to work many hours of unpaid compensation. Lunch breaks were rarely given to lot workers, but at least a half hour per day was deducted from her paycheck for a lunch break that was never taken. In addition, she reported to work at the same location at which the other Drivers met with their Lead Driver and to/from crews. However, after arriving, the only way she could get to the lot where she performed her assignment was by being transported by a shuttle driver going to the lot. This regularly took from one and a half to two hours for which she was not paid.

288.    After Rivera took over, he immediately reduced Ms. Shorts' assignments from five to two days a week. Shorts had no legitimate blemishes on her record during her tenure.

She was regularly on time and performed all of her functions in a proficient and professional manner. Shorts could not make a living from 2 days of work per week.

289.    By October, it became clear that Rivera was not going to give Ms. Shorts more work because he was "laying off" all of the African-Americans while simultaneously hiring Hispanics. Ms. Shorts was therefore, for all practical purposes, terminated in October 2008.

290.    When Shorts began her employment with Stryden in the spring of 2008 time frame, the SPC Drivers and LD's were predominantly African-American. By the time she was forced out, it was apparent that the only employees being let go were African American, and the only employees being hired were Hispanic.

291.    Shorts was hired as an employee of Stryden. Until the fall of 2008, her pay checks were drawn on the account of Novos. She received a W-2 Form, and her income taxes were withheld from his paycheck. However, in the fall of 2008, her checks were thereafter drawn on the account of MLL, her taxes were not withheld, and she received a 1099 in lieu of a W-2.

292.    Absolutely nothing changed in terms of the reality of Shorts' daily employment relationship with Stryden. In regard to all aspects of their relationship, Stryden continued to exercise the same degree of "domination and control" over Shorts as it did the other plaintiffs. *See*, First Amended Class Action Complaint ¶¶ 60-62 and 144.

293.    Apart from the payroll checks Shorts received, no one who purported to be affiliated with Novos or MLL ever had any contact with her in the course of performing her duties on the SPC.

294.    Shorts seeks to recover the unpaid wages, minimum wages and/or overtime wages she was not paid for the "waiting time" to receive shift assignments and organizing the crew, and

the "wait time" for vehicles to transport her from the Stryden office and check in point to the lot, and time worked during lunch breaks she worked but for which she received no compensation.

295.     To the extent she worked more than forty hours a week, she is entitled to receive one and a half times his regular compensation, or $10.88 ($7.25 + $3.63 = $10.88), plus payment of an equal amount in liquidated damages because this is a willful violation, for a total of $21.76 for each hour of unpaid overtime incurred.  To the extent he worked hours without compensation during a week in which he worked less than a total of forty hours, for each unpaid hour he is entitled to compensation at his normal hour rate ($7.25), plus payment of an equal amount in liquidated damages for a total of $14.50 per hour.

296.     As Hispanics gained dominance in the workplace, for the reasons explained above, Shorts lost job opportunities made available to her Hispanic counterparts.  She was not allowed to work overtime, she received fewer assignments, was more likely to have to wait longer without compensation for the assignments she was called in to fill, was more likely to be disciplined or terminated for arbitrary and unjustifiable reasons, and knew that he was ultimately going to be terminated for no reason or invalid reasons because of his color, race and ethnicity.

297.     Shorts was personally subjected to the hostile racial environment described in ¶¶ 36-52 and 71-79 of this First Amended Class Action Complaint.

298.     Shorts was never given any handbook, policy or memorandum on how she might request an internal investigation of any claim of discrimination or harassment she might have, nor did the company offer any postings on this topic or provide any oral instructions.  It lacked any internal policies or procedures prohibiting or policing discrimination or harassment.

299.     Shorts has incurred loss of back pay and front pay as a result of defendants' violations and is entitled to compensatory damages, punitive damages, injunctive relief, and an award of attorneys' fees and costs.

## L.    James Horton

300.    Horton is has a valid driving license and a clean driving record.  For many years he has worked in the maintenance department for the Penn Valley School District at the Penn Valley elementary school. Throughout his tenure at the School District, he has regularly sought and retained additional full- and part-time work to supplement his income.  In April of 2010, he attempted to obtain a job with Stryden as a PAR Driver.  This opportunity was attractive because it would enable him to schedule his work in a way that would not interfere with his other obligations, and there appeared to be some flexibility in the number of shifts or hours he would have to work.

301.    In April 2010, Horton called Ruben at the same number used by the former Stryden employee, Thomas, to call Ruben.  After indicating his desire to submit an application for employment as a Driver, the only question Rueben wanted to know was how Horton got his number.  In a very curt conversation, Ruben told Horton that the company was not hiring and refused to provide Horton with any information as to how he might apply for a job.  Ruben concluded the call by hanging up on Horton.

302.    Horton believes, and therefore avers, that contrary to the representations made by Ruben, Stryden is considering, has continually considered, and will continue to consider Hispanic applications for employment.

303.    Horton's application for employment was summarily rejected as part of the pattern and practice of discrimination it continues to impose in which only Caucasian Hispanics are considered for employment.  In order to accomplish this goal, Stryden only considers employment applications that come through "approved" channels that are limited to Hispanic applicants.

304.     Horton has been injured by this discrimination because it has resulted in the denial of future back pay and front pay as well compensatory and punitive damages and attorneys fees.

## M.     Goldie Hemmingway

305.     Hemmingway has a valid driving license and a clean driving record.   For many years, he has worked in maintenance and at various odd jobs.  He is always on the outlook for full- or part-time work opportunities.

306.     In March of 2010, he attempted to obtain a job with Stryden as a PAR Driver by calling Rueben at the same number used by the former Stryden employee, Thomas, to call Ruben.  After indicating his desire to submit an application for employment as a Driver, the only question Rueben wanted to know was how Hemmingway got his number.  In a short conversation, Ruben told Hemmingway that the company was not hiring and refused to provide Hemmingway with any information as to how he might apply for a job now or in the future. Ruben resisted every effort made by Hemmingway to get information as to how he could have an application for employment as a Driver or LD considered at any time now or in the future and caused the conversation to end abruptly.

307.     Hemmingway believes, and therefore avers, that contrary to the representations made by Rueben Stryden is considering, and has continually considered and will continue to consider, Hispanic applications for employment..

308.     Stryden refused to consider Hemmingway's application for employment as part of the pattern and practice of discrimination it continues to impose in which only Caucasian Hispanics are considered for employment.  In order to accomplish, this goal Stryden only considers employment applications that come through "approved" channels that are limited to Hispanic applicants.

309.     Hemmingway has been injured by this discrimination because it has resulted in the denial of future back pay and front pay as well as compensatory and punitive damages.

## IX.  VIOLATIONS

### COUNT I

### THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981

**(All Plaintiffs v. All Defendants)**
**(Race, Color, National Origin, and Ethnic Discrimination and Retaliation)**

310.     Plaintiffs incorporate by reference and reallege as if fully set forth herein ¶¶ 1 to 310 of this First Amended Class Complaint.

311.     Stryden, acting alone or in concert with Defendants Novos and /or MLL has discriminated against Plaintiffs, each Class, and each member of each Class, by denying them the same rights as enjoyed by Caucasian Hispanic employees or independent contractors in regard to the making, performance, modification, and termination of their employment relationship with Stryden and or its affiliates, Novos and MLL, with regard to the enjoyment of all benefits, privileges, terms and conditions of that relationship, whether as employees or independent contractors, in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981.

312.     Defendants' conduct has been intentional, deliberate, and willful and conducted in callous disregard of the rights of Plaintiffs, each Class, and each member of each Class under the law.

313.     Stryden, and its affiliates, Novos or MLL have also engaged in conduct which may or may not have been intentional but has had an adverse impact upon the plaintiffs, each Class, and each member of each Class without a corresponding business justification or benefit.

# COUNT II

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## 42 U.S.C. § 2000e *et seq.*

### (Badger, Cambridge and Mitchell v. All Defendants )
### (Race, Color, National Origin, and Ethnic Discrimination and Retaliation)

314.     Plaintiffs reallege and incorporate by reference, ¶¶ 1-314 above.

315.     Plaintiffs Badger, Cambridge and Mitchell have dual filed Charges of

Discrimination with the EEOC and the PHRC, and Badger has received a right to sue letter.

316.     Stryden, acting alone or in concert with Novos and or MLL, has discriminated

against Plaintiffs, each Class, and each member of each Class with respect to the terms and

conditions of employment because of their race, color, national origin, and ethnicity in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended by the Civil

Rights Act of 1991.

317.     Defendants' conduct has been intentional and/or has had disparate impact on

Plaintiffs and the Class with respect to the terms and conditions of their employment.

318.     By virtue of  defendants' conduct as alleged herein, Plaintiffs, each Class, and

each member of each Class have been injured.

# COUNT III

## THE PENNSYLVANIA HUMAN RELATIONS ACT
## 43 P.S.§ 951, *et.seq*

### (Badger, Cambridge, and Mitchell v. All Plaintiffs)
### (Race, Color, National Origin, Ethnic, and Age Discrimination and Retaliation)

319.     Plaintiffs reallege and incorporate by reference ¶¶ 1-319 above.

320.     Badger, Cambridge, and Mitchell have dual filed charges of discrimination with

the EEOC and the PHRC and Badger has received a right to sue for race, ethnic, skin color, and

age discrimination.

321.     Stryden, acting alone or in concert with Novos and/or MLL, has discriminated against Plaintiffs, each Class, and each member of each Class by denying them the same rights as enjoyed by Caucasian Hispanic employees or independent contractors in regard to the enjoyment of all benefits, privileges, terms and conditions of employment, whether as employee or independent contractors, in violation of the PHRA, 43 P.S. 951, *et. seq.*

322.     Defendants' conduct has been intentional and/or has had disparate impact on Plaintiffs and the Class with respect to the terms and conditions of their employment.

323.     By virtue of defendants conduct as alleged herein, Plaintiffs, each Class, and each member of each Class have been injured.

## COUNT IV

### THE AGE DISCRIMINATION IN EMPLOYMENT ACT
### 29 U.S.C. § 621

### (Badger v. Stryden )
### (Age Discrimination and Retaliation )

324.     Plaintiffs reallege and incorporate by reference ¶¶ 1-324 above.

325.     Stryden has discriminated against Badger and similarly situated older former Tandem employees on the basis of age in violation of the ADEA.

326.     By virtue of Stryden's conduct Badger and those who are similarly situated have been injured.

## COUNT V

### THE FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 201, et.seq.

**(Cambridge, Mitchell, Thomas, Hardy, Abdul-Karmin, Johnson,
Shorts, Jackson, and Kennedy v. All Defendants)
(Unpaid Wages And Unpaid Overtime Wages)**

327.     Plaintiffs reallege and incorporate by reference ¶¶ 1-327 above.

328.     Stryden, acting alone or in concert with defendants Novos and or MLL, has

violated the FLSA by failing to pay plaintiffs and those who are similarly situated wages,

minimum wages, and overtime wages.  FLSA plaintiffs are entitled to obtain or recover unpaid

wages, unpaid minimum wages, unpaid overtime wages, liquidated damages, injunctive relief,

and attorney's fees.

## COUNT VI

### THE DECLARATORY JUDGMENT ACT
### 28 U.S.C. § 2201

**(All Plaintiffs v. All Defendants)**

329.     Plaintiffs reallege and incorporate by reference ¶¶ 1-329 above.

330.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*. are entitled

to declarations that: 1) Stryden, acting alone or in concert with Novos and/or MLL, from

September 2008 until the present has engaged in a pattern and practice of discrimination against

black African-Americans based on race, skin color, national origin, ethnicity, and/or age; and

2) SPC Drivers and Lead Drivers never became "independent contractors" for purposes of

Title VII, the FLSA, and the payment of payroll taxes.

## X.     <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury as to all issues so triable.

# XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter an order:

A)    Certifying this action as a class action with Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

B)    Certifying this case as a collective action and providing for the  issuance of court approved notice that may be sent to putative class members so they may given an opportunity to "opt in" to the litigation;

C)    Adjudicating and declaring that the conduct of Stryden, acting alone or in concert with its affiliates, Novos and/or MLL, violated 42 U.S.C. § 1981, 42 U.S.C. § 2000e *et seq.*, and 43 P.S. § 951, *et.seq.* the ADEA, 29 U.S.C. 621, *et. seq.* and 29 U.S.C. § 201, *et seq.*

D)    Permanently enjoining and prohibiting Stryden and its affiliates, Novos and MLL, and its officers, agents, employees and successors from continuing to engage in the practices complained of herein;

E)    Permanently enjoining and requiring Stryden and its affiliates, Novos and MLL, to adopt policies and practices that ensure the cessation of all discriminatory practices affecting the Individual Plaintiffs, each Class, and each Class member requiring the institution of such measures as to ensure that these practices do not re-emerge;

F)    Awarding Plaintiffs, each  Class, and each member of each Class, such equitable remedies including, without limitation, back pay and front pay necessary to provide the Individual Plaintiffs and the Class with full relief from the discrimination they have suffered;

G)    Awarding the Individual Plaintiffs, each Class, and each member of each class compensatory damages justified under the circumstances;

H)    Awarding the Individual Plaintiffs and each Class, and each member of  each Class punitive damages justified under the circumstances;

I)      Awarding attorneys' fees and reimbursement of costs associated with this action

to Plaintiffs' Counsel;

J)      Retaining jurisdiction to ensure that Stryden, Novos and MLL fully complies with

the equitable relief ordered; and

K)      Awarding Plaintiffs and the Class such other and further legal and equitable relief

as may be appropriate in the interest of justice.


                                            **SIDNEY L. GOLD & ASSOCIATES**


                              By:      /s/ Sidney L. Gold
                                       Sidney L. Gold
                                       1835 Market Street, Suite 515
                                       Philadelphia, PA 19103
                                       (215) 569-1999

                                       and

                                       **BERGER & MONTAGUE**


                              By:      /s/ William T. Coleman, III
                                       William T. Coleman, III
                                       1622 Locust Street
                                       Philadelphia, PA 19103
                                       (215) 875-3074

Dated: May 6, 2010

## CERTIFICATE OF SERVICE

I, William T. Coleman III, hereby certify that on May 4, 2010 I have caused the plaintiff's

attached Motion For Leave To File a Reply Brief In Response To Defense Objections Precluding

The Claims Asserted In The First Amended Class and Collective Action Complaint From Relating

Back To The Date The Original Complaint Was Filed upon counsel identified below for Novos

Associates . LLC and Stryden, Inc, via ECF on May 6,  2010:

Stephanie K. Rawitt, Esq.
Lee C. Durivage, Esq.
Marshall, Dennehey, Warner, Coleman and Goggin
1845 Walnut Street, 19th Floor
Philadelphia, P A 19103
skrawitt@mdwcg.com
lcdurivage@mdscg.com

I further certify that I have caused a copy of Plaintiffs Motion For Leave To  File A

First Amended Class Action Class and Collective Action Complaint  originally filed with

Court on April 14 , 2010, the Revised Exhibit "A" filed with the Court on April 16, 2010,

Memorandum of Law In Response To Plaintiffs Motion For Leave To File A First Amended

Class and Collection Complaint originally filed with the Court via ECF on April 27, 2010, and

Plaintiffs Motion For Leave To File a Reply Brief In Response To Defense Objections Precluding

The Claims Asserted In The First Amended Class and Collective Action Complaint From Relating

Back To The Date The Original Complaint Was Filed upon Major Logistics LLC which has been

filed on May 6, 2010  by mailing a copy of the aforsesaid pleadings by US Mail , Return Receipt

Requested, to the President of Major Logistics LLC to:

Mr. Cliff Hendricks

President
Major logistics LLC
1231 Chestnut Street
PMB 1
Philadelphia , Pa. 19107-51

_/s/ William T. Coleman III_
William T. Coleman